# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| MELISSA HICKSON, Individually and )<br>MELISSA HICKSON as the DEPENDENT )<br>ADMINISTRATOR of the ESTATE OF )<br>MICHAEL HICKSON, DECEASED, and )<br>MELISSA HICKSON AS NEXT FRIEND )<br>OF MACKENZIE HICKSON; MACEO )<br>HICKSON AND MADISON HICKSON, all )<br>minors, AND MARQUES HICKSON, )<br> )<br> Plaintiffs, )<br> )<br> v. )<br> )<br>ST. DAVID'S HEALTHCARE )<br>PARTNERSHIP, L.P., LLP, doing business )<br>as ST. DAVID'S SOUTH AUSTIN )<br>MEDICAL CENTER, DR. DEVRY )<br>ANDERSON, INDIVIDUALLY, HOSPITAL )<br>INTERNISTS OF TEXAS, DR. CARLYE )<br>MABRY CANTU, Individually, DR. VIET )<br>VO, Individually, )<br> Defendants. ) | Cause No. 1:21-cv-514 |

## COMPLAINT

Melissa Hickson, individually as the Dependent Administrator of the Estate of Michael Hickson, Deceased, and as the Next Friend of Mackenzie Hickson, Maceo Hickson and Madison Hickson, all minors; and Marques Hickson, by their attorneys, Mark Whitburn and Sean Pevsner, Whitburn & Pevsner, PLLC, and Jennifer Sender and Andrés Gallegos of Robbins Salomon & Patt, Ltd., for their Complaint against Defendants St. David's Healthcare Partnership, L.P., LLP, doing business as St. David's South Austin Medical Center, Dr. Devry Anderson, Individually, Hospital Internists of Texas, Dr. Carlye Mabry Cantu, Individually, Dr. Viet Vo, Individually, state as follows:

## **TABLE OF CONTENTS**

Introduction                                                                      Page 4

Jurisdiction and Venue                                                            Page 7

Parties                                                                           Page 7

Pre-Suit Statutory Compliance                                                    Page 9

Facts                                                                            Page 10

Count I: Disability-Based Discrimination under Section 504 of the                Page 19
Rehabilitation Act of 1973, 29 U.S.C. § 794 (Against Defendant Hospital by
Mrs. Hickson as the Dependent Administrator of the Estate of Michael
Hickson, Deceased, on behalf of Mr. Michael Hickson, individually under
the Texas Survival Act)

Count II: Violation of Section 1557 of the Patient Protection and Affordable     Page 22
Care Act, 42 U.S.C. § 18116 (Against Defendant Hospital by Mrs. Hickson
as the Dependent Administrator of the Estate of Michael Hickson, Deceased,
on behalf of Mr. Michael Hickson, individually under the Texas Survival
Act)

Count III: Negligence Under Texas Medical Liability Act, Tx. Civ. Prac. &        Page 24
Rem. Code §§ 74.001 *et seq.* (Against Defendants Dr. Cantu and Dr. Vo,
jointly and severally, by Mrs. Hickson as the Dependent Administrator of the
Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson,
individually under the Texas Survival Act)

Count IV: Negligence *Per Se* in their Failure to Follow the Procedures Set      Page 27
Forth in § 166.044(d) of the Texas Health & Safety Code (Against
Defendants Dr. Cantu and Dr. Vo, jointly and severally, by Mrs. Hickson as
the Dependent Administrator of the Estate of Michael Hickson, Deceased, on
behalf of Mr. Michael Hickson, individually under the Texas Survival Act)

Count V: Negligence in Obtaining Informed Consent (Against the Defendant         Page 28
Hospital and Defendant Hospital Internists, jointly and severally, by Mrs.
Hickson as the Dependent Administrator of the Estate of Michael Hickson,
Deceased, on behalf of Mr. Michael Hickson, individually under the Texas
Survival Act)

Count VI: Negligence in Failing to Guide Ms. Jessica Drake, a Trainee, Possessing a Provisional Guardianship Certificate in Substituted Decision-Making (As Against Defendants Dr. Cantu and Dr. Vo, Jointly and Severally, by Mrs. Hickson as the Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson, Individually under the Texas Survival Act)     Page 32

Count VII: Negligence (Against the Defendant Hospital in Defendant Hospital Internists, Jointly and Severally, by Mrs. Hickson as the Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson, individually under the Texas Survival Act)     Page 34

Count VIII: Section 1983 Civil Action for Deprivation of 14th Amendment Right to Life, 42 U.S.C.A. § 1983 (Against Defendant Hospital, Defendant Dr. Cantu and Defendant Dr. Vo, Jointly and Severally, by Mrs. Hickson as the Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson, Individually under the Texas Survival Act)     Page 37

Count  IX: Wrongful Death Under The Wrongful Death Statute, Tex.Civ.Prac. & Rem.Code §§ 71.001 *Et Seq.* (Against all Defendants, Except Dr. Anderson, Jointly and Severally, on behalf of Plaintiff Mrs. Hickson, Individually, and as the Next Friend of Plaintiffs Mackenzie Hickson, Maceo Hickson and Madison Hickson and by Plaintiff Marques Hickson)     Page 39

Count X: Intentional Infliction of Emotional Distress (Against Defendant Dr. Anderson and Defendant Hospital, on Behalf of Plaintiff Mrs. Hickson, Individually)     Page 42

Jury Demand     Page 47

***

## INTRODUCTION

1.     A life not worth living. A person not worth treating. Those were the beliefs of physicians at St. David's South Austin Medical Center - verbally expressed and acted upon – when for six days, despite the absence of a terminal or irreversible condition, all life-sustaining treatment, including artificial nutrition and hydration, were withdrawn from a 46-year-old black man with multiple disabilities, resulting in his death.

2.     Mr. Michael Hickson ("Mr. Hickson"), a father of five and married for 18 years to his wife, Plaintiff Melissa Hickson ("Plaintiff" and sometimes referred to herein as "Mrs. Hickson"), joined the disability community in a fraction of a second as a result of sudden cardiac arrest in 2017. The cardiac arrest caused a temporary deprivation of oxygen, which resulted in an Anoxic brain injury and cortical blindness, and aggressive attempts to resuscitate him resulted in a spinal cord injury. As a result, Mr. Hickson had functional impairments of motor weakness, cognition, speech or expressive language, swallowing function, bowel and bladder, and he required cough secretion management. His impairments, while chronic, were static and not progressive.

3.     Physicians at St. David's South Austin Medical Center could not see beyond Mr. Hickson's disabilities. Seeing nothing of Mr. Hickson other than his disabilities, they determined that his disabilities diminished the quality, or perhaps value, of his life and they discarded him and left him to die.

4.     Shocking, but not surprising. *Health Affairs* published a study in February of 2021 revealing that 82.4% of US physicians nationwide believe that people with significant disabilities have worse quality of life than nondisabled people.[1] This is the latest contribution to a well-

---

[1] Iezzoni LI, Rao SR, Ressalam J, Bolcic-Jankovic D, Agaronnik ND, Donelan K, Lagu T, Campbell EG. Physicians' Perceptions Of People With Disability And Their Health Care. Health Aff (Millwood). 2021 Feb;40(2):297-306. doi: 10.1377/hlthaff.2020.01452. P.M.ID: 33523739. Available at: Physicians' Perceptions Of People With Disability And Their Health Care | Health Affairs

established body of literature acknowledging healthcare providers' implicit bias, attitudes and beliefs contribute to inadequate or inappropriate clinical decisions and result in the failure to make appropriate recommendations for preventive care for minority and ethnic groups, as well as persons with disabilities.[2] In 2020, research published by The Council on Quality and Leadership, analyzed the results of disability implicit attitude tests from 25,006 health care providers to reveal the overwhelming majority were implicitly biased against people with disabilities. The study underscored that healthcare providers' beliefs and attitudes about social minorities and marginalized groups are key factors that contribute both to healthcare access and outcome disparities directly influencing behaviors around inpatient encounters, clinical decision-making and referral care.[3]

5.       On June 2, 2020, Mr. Hickson was taken to St. David's South Austin Medical Center for acute respiratory illness due to pneumonia, urinary tract infection, sepsis and suspected COVID–19. Those were  similar conditions for which he was successfully treated at that very same hospital approximately three months earlier. Although he was seriously ill, each of those conditions was treatable. St. David's South Austin Medical Center's assessment of Mr. Hickson's

---

[2] *See* Dovidio, J., & Fiske, S., Under the radar: How unexamined biases in decision-making processes in clinical interactions can contribute to health care disparities. *American Journal of Public Health*, 2012, 102(5), 945-952. doi:10.2105/ AJPH.2011.300601; Dovidio, J., *et al.,* Implicit discrimination and discrimination against people with physical disabilities, R. Wierner & S. Willborn (Eds.), *Disability and Aging Discrimination,* 2011, Springer, New York, NY. https://doi.org/10.1007/978-1-4419-6293-5_9; Hall, W., et al., Implicit Racial/Ethnic Bias Among Health Care Professionals and Its Influence on Health Care Outcomes: A Systematic Review. *Am J Public Health*. 2015 Dec;105(12):e60-76. doi: 10.2105/AJPH.2015.302903. Epub 2015 Oct 15. P.M.ID: 26469668; P.M.CID: P.M.C4638275; McKinlay, John, *et al.*, The Unexpected Influence of Physician Attributes on Clinical Decisions. *Journal of Health and Social Behavior*. 2002. 43. 92-106. 10.2307/3090247; Vasiliki Matziou, et al., "Attitudes of Nurse Professionals and Nursing Students Towards Children with Disabilities. Do Nurses Really Overcome Children's Physical and Mental Handicaps?" *International Nursing Review* 56, no. 4 (2009): 456–60; Raymond C. Tervo et al., "Medical Students' Attitudes Toward Persons with Disability: A Comparative Study," *Archives of Physical Medicine and Rehabilitation* 83, no. 11 (2002): 1537–42; Raymond C. Tervo, Glen Palmer, and Pat Redinius, "Health Professional Student Attitudes Towards People with Disability," *Clinical Rehabilitation* 18, no. 8 (2004): 908–15.
[3] VanPuymbrouck, L., *et al*. Explicit and implicit disability attitudes of healthcare providers. *Rehabilitation Psychology*. 2020. Advance online publication. https://doi.org/10.1037/rep0000317

risk of mortality, which was conducted upon his arrival at the emergency department, predicted that he had a 70% chance of surviving his conditions, just as he did only months earlier.

6.     Antibiotics were initially provided to treat Mr. Hickson's underlying infections, and lab results demonstrated improvement in his symptoms. Then, with no explanation in his medical records, his physicians abruptly stopped the antibiotics. With the consent of a court appointed temporary guardian, his physicians transferred Mr. Hickson to inpatient hospice, changed his code status from full code to do not resuscitate ("DNR"), and withdrew all life-sustaining treatment including artificial nutrition and hydration.

7.     When Mrs. Hickson challenged her husband's physicians and pressed for an explanation as to why they would not treat him and just let him die, one of his physicians, Defendant Dr. Vo, bluntly told her "as of right now, his quality of life, he doesn't have much of one." When pressed for a further explanation, Defendant Dr. Vo stated that as Mr. Hickson is paralyzed and has a brain injury, he has no quality of life. The physician then distinguished Mr. Hickson from other of his patients who were being treated aggressively for Covid–19, "his quality of life is different than theirs. They were walking, talking."

8.     To be clear, Mr. Hickson was not taken to St. David's South Austin Medical Center to be cured of his disabilities.

9.     For six days St. David's South Austin Medical Center allowed Mr. Hickson to lay dying in hospice, without any life-sustaining treatment. Except for a trickle of nutrition when he expressed hunger between sedations on June 8, 2020, and then only briefly at a low rate for comfort, which was abruptly stopped later that day, Mr. Hickson was left without nutrition and hydration during those six days until he died on June 11, 2020, at 10:10 p.m.

10.     Mr. Hickson was not a casualty of the pandemic. St. David's South Austin Medical Center's medical director admitted in a media posting that the circumstances surrounding Mr. Hickson's demise was not attributed to rationing choices or a surge of COVID-19 patients.

11.     Mr. Hickson was a casualty of deadly discriminatory ableist views held by physicians that determined his life was not worth living and not worth treating.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331 as they arise under Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794, *et seq*.; and Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 U.S.C. § 18116; and pursuant to 28 U.S.C. §§ 1343(a)(3) &(4) because they seek to redress the deprivation, under color of state law, of Mr. Hickson's civil rights and to recover damages for violation of his rights. This Court has supplemental jurisdiction to consider state causes of action under 28 U.S.C. § 1367, as the state claims "form part of the same case or controversy" as the federal claims over which the Court has jurisdiction.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) as all of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

14.     Plaintiff Melissa Hickson  is 48 years old and is the widow of Mr. Michael Hickson, deceased. Mrs. Hickson resides with her five children in the City of Round Rock, County of Williamson, State of Texas. Mrs. Hickson was appointed the Dependent Administrator of the Estate of Michael Hickson, Deceased, by the Clerk of the County Court, Williamson County, Texas on October 16, 2020.

15.     Plaintiff Marques Hickson, 18 years of age, is the biological son of Mr. Hickson and Plaintiff Melissa Hickson. Plaintiff Marques Hickson resides with Plaintiff Mrs. Hickson and his siblings.

16.     Plaintiff Mackenzie Hickson, a minor, is the biological daughter of Mr. Hickson and Plaintiff Melissa Hickson. Plaintiff Mackenzie Hickson resides with Plaintiff Mrs. Hickson and her siblings.

17.     Plaintiff Maceo Hickson, a minor, is the biological son of Mr. Hickson and Plaintiff Melissa Hickson. Plaintiff Maceo Hickson resides with Plaintiff Mrs. Hickson and his siblings.

18.     Plaintiff Madison Hickson, a minor, is the biological son of Melissa Hickson. Plaintiff Madison Hickson resides with Plaintiff Mrs. Hickson and his siblings.

19.     St. David's HealthCare Partnership, L.P., LLP ("St. David's HealthCare"), d/b/a St. David's South Austin Medical Center (referred to herein as "Defendant Hospital"), is a Texas domestic limited partnership. St. David's HealthCare is one of the largest health systems in Texas with more than 119 sites across Central Texas. It participates in the Medicare and Medicaid program.[4]  St. David's HealthCare include seven of the area's largest hospitals. St. David's HealthCare is the third largest private employer in the Austin area with more than 10,200 employees. Its principal place of business is located within this judicial district at 98 San Jaciento Boulevard, Suite 1800, Austin, TX 78701.

20.     Dr. DeVry Anderson ("Defendant Dr. Anderson"), is a physician, duly licensed in the state of Texas by the Texas Medical Board. Defendant Dr. Anderson is employed by Defendant

---

[4] St. David's Healthcare is a subsidiary of HCA Healthcare, Inc. ("HCA"), a Delaware corporation. In consolidated financial statements, for the year ended December 31, 2020, HCA reported revenues of $10,20 billion in Medicare reimbursements and $6,997 billion in Medicare Managed Care revenue per its 2020 SEC 10k. Available at: 0001193125-21-048994 (d18rn0p25nwr6d.cloudfront.net).

Hospital, serving as its chief medical officer. Defendant Dr. Anderson's current primary practice address is at Defendant Hospital, 901 W. Ben White Boulevard, Austin Texas 78704.

21.     Defendant Hospital Internists of Texas ("Defendant Hospital Internists") is a nonprofit corporation organized under the Texas Nonprofit Corporation Act and certified as a nonprofit organization under the Texas Medical Practice Act, Tex. Occ. Code § 162.001(b). Its principal place of business is located within this judicial district at 7000 N. Mopac Expressway, Suite 420, Austin, TX 78731.

22.     Defendant Dr. Carlye Mabry Cantu ("Defendant Dr. Cantu"), is a physician, duly licensed in the state of Texas by the Texas Medical Board, possessing specialty board certification from the American Board of Internal Medicine, with hospital privileges at the Defendant Hospital. On information or belief, Dr. Cantu is employed by, or is a principal of Defendant Hospital Internists. Dr. Cantu's current primary practice address is at the Defendant Hospital, 901 W. Ben White Boulevard, Austin Texas 78704.

23.     Defendant Dr. Viet Vo ("Defendant Dr. Vo"), is a physician, duly licensed in the state of Texas by the Texas Medical Board, possessing specialty board certification from the American Board of Emergency Medicine as well as the American Board of Internal Medicine/Critical Care Medicine, with hospital privileges at the Defendant Hospital. On information or belief, Defendant Dr. Vo is self-employed. His current primary practice address is at 901 W. Ben White Boulevard, Austin, TX 78704.

## PRE-SUIT STATUTORY COMPLIANCE

24.     Plaintiff has served pre-suit notices and authorizations more than 60 days prior to filing this lawsuit as required by TEX. CIV. PRAC. & REM. CODE § 74.051.

## FACTS

25.     On May 24, 2017, while living in Dallas, Texas, Mr. Hickson suffered sudden cardiac arrest which temporarily deprived his brain of oxygen resulting in Anoxic brain injury resulting in short-term memory loss, vision loss and slow speech. As a result of the extensive CPR administered by first responders, Mr. Hickson also sustained a spinal cord injury resulting in quadriplegia. As a result, Mr. Hickson required assistance in certain activities of daily living such as eating, dressing, grooming, bathing, bowel and bladder management, transferring to and from his wheelchair, among other activities.

26.     Despite Mr. Hickson's considerable disabilities, in the months, weeks and days before his hospitalization at Defendant Hospital, he was alert, responsive, laughed at jokes, talked with his wife and kids as he was able to speak, albeit limited, slower and muted, but his speech was understandable. He also responded yes" or "no" to questions with head nods and shakes. He enjoyed doing math calculations with his children, prayed together with his wife and would sing with his wife and children.

27.     In the three years post-injury, Mr. Hickson had multiple hospitalizations for recurring urinary tract infections, sepsis and pneumonia which, unfortunately, occur with great frequency to persons with the disabilities that Mr. Hickson had. Persons sustaining high-level spinal cord injuries are susceptible to autonomic dysreflexia which causes chronic immune suppression that leaves them more susceptible to infections, which if not treated properly, can lead to untimely death.[5]

---

[5] See Benedikt Brommer, Odilo Engel, *et al.,* Spinal cord injury-induced immune deficiency syndrome enhances infection susceptibility dependent on lesion level, *Brain*, Volume 139, Issue 3, March 2016, Pages 692–707, https://doi.org/10.1093/brain/awv375

28.     Shortly after his injury, while still living in Dallas, Mrs. Hickson filed for temporary guardianship over Mr. Hickson. In early 2018, Mrs. Hickson filed for permanent guardianship. Shortly after the application was filed, the family moved to the Austin area.  In October 2019, Mrs. Hickson renewed her efforts to obtain permanent guardianship in Travis County. Her petition for permanent guardianship was contested by one of Mr. Hickson's three sisters, who is a physician This was unexpected by the family, because this sister had not engaged with Mr. Hickson during the almost two and a half years since he acquired his disabilities. Pending a hearing for permanent guardianship, the probate court appointed Family Eldercare, Inc. ("Family Eldercare"), an Austin-based nonprofit guardianship program, as Mr. Hickson's temporary guardian. Ashley Nicole Yates ("Ms. Yates"), a Family Eldercare employee, was specifically assigned as his temporary guardian until April 1, 2020, when one of her  trainee-subordinates, Jessica Drake ("Ms. Drake"), assumed those duties.

29.     In March 2020, Mr. Hickson was treated at Defendant Hospital for double pneumonia and sepsis. Upon his discharge from Defendant Hospital,  he was admitted to Brush Country Nursing and Rehabilitation in Austin. While there, on May 8, 2020, he tested positive COVID–19 but was asymptomatic. On May 29, 2020, Mr. Hickson was retested for COVID-19 and the results were negative.

30.     On June 2, 2020, Mr. Hickson was taken to Defendant Hospital for acute respiratory illness due to pneumonia, urinary tract infection, sepsis and suspected COVID–19. These were similar conditions for which he was successfully treated at Defendant Hospital approximately three months earlier.

31.     Although he was seriously ill, each of those conditions was treatable. Defendant Hospital's assessment of Mr. Hickson's risk of mortality, utilizing the Modified Early Warning

Score[6], a nursing tool used to identify patients who might need or benefit from higher levels of care, which was conducted upon his arrival at the emergency department, predicted that he had a 70% chance of surviving his conditions, just as he did only months earlier.

32.     Despite the assessment of 70% chance of survival, almost immediately upon his arrival to Defendant Hospital's emergency department, an emergency medicine physician, Dr. Steven Jennings, recommended to a hospitalist, Defendant Dr. Cantu, who soon afterwards would become Mr. Hickson's attending physician, that Mr. Hickson be placed in hospice, and at the very least, to change his code to DNR.

33.     In less than one hour after Mr. Hickson arrived at the emergency department, without considering or assessing any potential treatment response, Defendant Dr. Cantu, chose a plan to place Mr. Hickson on DNR and transfer him to hospice. She devised a care plan consisting of "comfort care" and she requested assistance from palliative care personnel. Defendant Dr. Cantu indicated to palliative care that Mr. Hickson had a poor quality of life as a result of his disabilities. She recorded in Mr. Hickson's medical records "… [s]hould family and, if able, patient choose, I do believe comfort measures would be a kind choice."

34.     On June 3, 2020, Mrs. Hickson was informed by Ms. Drake that Mr. Hickson was in the intensive care unit ("ICU"). Tests showed that he had urinary tract infection and sepsis. He was being treated with antibiotics and was on oxygen for breathing support.

---

[6] Annadita Kumar, et al., The Modified Early Warning Score as a Predictive Tool During Unplanned Surgical Intensive Care Unit Admission, *Ochsner Journal*, Jun 2020 (2) 176 – 181; DOI: 10. 31486/toj. The Modified Early Warning Score (MEWS) has been proposed to warn healthcare providers of the potential development of serious adverse events, including unplanned escalation of care. MEWS is composed of bedside measurements of heart rate, respiratory rate, systolic blood pressure, temperature and level of consciousness (alert, responsive to voice, responsive to pain, and unresponsive). The value of these measurements is scored and ranked with a clinical response initiated once predetermined threshold scores are exceeded.

35.     On the afternoon of June 3, 2020, Defendant Dr. Cantu reiterated her request to the palliative care team. Between June 3 and June 5, 2020, Mr. Hickson's health fluctuated. He showed evidence of quickly responding to antibiotics, but he had intermittent desaturations of oxygen for which he needed more oxygen via a nasal cannula and a BiPAP machine. Mr. Hickson experienced lung aspiration and feeding stopped through a gastrostomy tube, a process used since March 2018. He required periodic moderate assistance to clear secretions, which helped his condition. He was experiencing high fevers.

36.     On June 4, 2020, Ms. Drake emailed Mrs. Hickson informing her that Mr. Hickson was stable. In fact, the medical records indicate that his vital signs were improved. At 10:37 a.m., tube feeds were restarted. Later, at 4:47 p.m., Ms. Drake emailed Mrs. Hickson to inform her "I spoke with Michael's Dr. at the Hospital and she informed me that he now has a UTI and sepsis in addition to pneumonia and COVID. He does however appear to be responding to the antibiotics and at times requires minimum oxygen (both good signs) … As of now he is FULL CODE but his status would need to be changed if we all decide against intubation."

37.     Indeed, in response to antibiotics, his renal function had normalized. A bacterial organism had been identified on June 4, 2020 with a positive blood culture and urine culture for Extended Spectrum Beta-Lactamases (ESBL) Klebsiella. This was an important finding as it allowed the identified infectious organism to be better treated with an antibiotic targeted to the sensitivity pattern.

38.     In the early afternoon on June 5, 2020, Mrs. Hickson, accompanied by a friend, was permitted to visit Mr. Hickson. She was, however, restricted from entering his room and was only able to interact with him through FaceTime from the hallway in the ICU. At that time, Mr. Hickson was very responsive, smiling and reacting to their conversation. Mrs. Hickson had their

five kids join the FaceTime call and Mr. Hickson was even more responsive and interacting with them. After they finished FaceTime, a nurse spoke to Mrs. Hickson and informed her that he would be transferred to inpatient hospice. She was also informed that Mr. Hickson had pressure sores on his back, which proved later to be false. Mrs. Hickson then asked to speak with his doctor.

39.     Shortly thereafter, Defendant Dr. Vo, one of Mr. Hickson's providers at Defendant Hospital, met with Mrs. Hickson and the family friend and informed them that Mr. Hickson was being moved to hospice and placed on DNR. When Mrs. Hickson challenged Defendant Dr. Vo and pressed for an explanation as to why they would not treat him instead of just letting him die, Defendant Dr. Vo told her, "as of right now, his quality of life, he doesn't have much of one." When pressed to clarify, Defendant Dr. Vo explained that because of Mr. Hickson's paralysis and brain injury, he has no quality of life. Defendant Dr. Vo then distinguished Mr. Hickson from other of his patients who were being treated aggressively for COVID–19, "his quality of life is different than theirs. They were walking, talking." Mrs. Hickson was distraught and overcome by emotions.

40.     On June 5, 2020, at 3:45 p.m., there was clear evidence that  the administered intravenous antibiotic, Rocephin,  was effective, and the identification of the specific bacterial organism causing the pneumonia allowed for targeted antibiotics. Despite these positive developments, his physicians abruptly stopped the antibiotics and transferred Mr. Hickson to hospice within Defendant Hospital, issued a DNR order. and ordered the withdrawal of all life-sustaining treatment, including intravenous hydration and nutrition.

41.     On June 5, 2020, at the time the decision was made by the Defendants Dr. Cantu and Dr. Vo to withdraw all life-sustaining treatment from Mr. Hickson, Mr. Hickson had neither a terminal condition nor an irreversible condition. Further, Mr. Hickson's survival rate was still assessed by St. David's as 70%.

14

42.     On June 5, 2020, Defendant Dr. Vo completed and executed a Family Eldercare Guardianship Services preprinted Treatment Decision Form ("Treatment Decision Form") as follows:

A.      To provide a brief description of current medical conditions, Defendant Dr. Vo wrote: "chronic – anoxic encephalopathy [3 letters unreadable] acute – respiratory failure, pneumonia, SARS2 corona virus."

B.      To provide a description of relevant treatment options, Defendant Dr. Vo wrote: "mechanical ventilator with intubation, BiPAP, vasopressors, fluids."

C.      To provide an explanation of the prognosis for the patient with and without recommended treatments, and requiring evidence concerning success of treatment, pain/discomfort management, futility of treatment, and anticipated return to baseline functioning. Defendant Dr. Vo wrote: "with treatment," "[p]oor as treatment is difficult and likely won't change outcome futile." "Without treatment," Defendant Dr. Vo wrote: "Poor. Likely death."

D.      In response to the question of whether there are any ethical issues or conflicts regarding treatment options and the client prognosis. Defendant Dr. Vo wrote: "No."

E.      In response to an inquiry as to the physician's advice for treatment based on the information provided, Defendant Dr. Vo wrote: "Given baseline functions, recoverability, prognosis of those with COVID–19 likely poor outcome regardless of interventions. comfort/hospice is appropriate."

43.     To support the decision to render Mr. Hickson DNR, transfer to hospice and withhold all life-sustaining treatment including artificial nutrition and hydration, one of Mr. Hickson's physicians recorded in the medical records that Mr. Hickson was in "multi-organ system failure." That was false. At the time those decisions were made on June 5, 2020, Mr. Hickson was not in multi-organ system failure. At most, there was evidence of worsening respiratory status with mucus plugging, but Mr. Hickson's worsening respiratory status was, however, directly attributed to the abrupt withdrawal of the antibiotics despite clear evidence of positive response to the antibiotic and after having identified the specific infectious bacterial organism.

44.     On June 6, 2020, Mrs. Hickson called the Defendant Hospital. One of Mr. Hickson's nurses confirmed that he was in fact coded DNR, and was not receiving food, IV fluids or antibiotics. He was receiving nothing but pain medications. Mrs. Hickson went to the Defendant Hospital and was told no visitors were allowed. She had to wait in the lobby and was able to FaceTime with Mr. Hickson. She was subsequently permitted onto the hospice floor to see Mr. Hickson in his room at the very end of a long hallway, away from everything. She saw that Mr. Hickson was not receiving fluids  or oxygen, and confirmed he was not receiving any antibiotics or other treatments.

45.     On June 7, 2020, after attempting to reach Family Eldercare via email, Mrs. Hickson called the Defendant Hospital for an update. Defendant Dr. Cantu spoke briefly with Mrs. Hickson. Mrs. Hickson pleaded for her to change Mr. Hickson's code status back to DNR and she was informed that only Ms. Drake could make that request.

46.     On June 8, 2020, a hospice nurse noted that Mr. Hickson was alert, nodding his head when asked questions and followed commands when asked to open his mouth for suctioning. Mr. Hickson also responded that he was hungry. At 8:59 a.m., tube feeding was started at a low trickle rate "for comfort as patient express hunger."

47.     On June 8, 2020, at 9:35 a.m., Defendant Dr. Cantu noted that Mr. Hickson was "actually having somewhat better respiration," despite the fact that he was now not on oxygen. Defendant Dr. Cantu then sent messages to both Defendant Hospital's ethics consultant and a palliative care nurse requesting further guidance that Mr. Hickson may no longer be "[general inpatient care hospice] appropriate." based on this improvement. Despite this additional positive development, Defendants never restarted his life-sustaining treatments, nutrition or hydration.

48.     On June 8, 2020, after repeated attempts to contact Ms. Drake, Mrs. Hickson received an email from Ms. Yates, Ms. Drake's supervisor at Family Eldercare. Ms. Yates mentioned that Mr. Hickson showed improvement and that hospice may have to be reevaluated. Mrs. Hickson then called the Defendant Hospital for an update and was only told that Mr. Hickson was "comfortable". Mrs. Hickson requested to FaceTime with Mr. Hickson and was told they would call her back, but they never did.

49.     On June 9, 2020, Mrs. Hickson called the Defendant Hospital for an update and again was told he was "comfortable." She again requested FaceTime with him and was again told they would call her back, but they never did.

50.     On June 10, 2020, Mrs. Hickson once again called the Defendant Hospital for an update and was again told that he was "comfortable". She was then informed that the Defendant Hospital's iPad had been broken but they would find another one and call her back. Again,  they never did.

51.     On June 11, 2020, Mrs. Hickson called the Defendant Hospital for an update and was advised that no information was available about Mr. Hickson, and she was told to contact Family Eldercare. Mrs. Hickson sent an email to Ms. Drake and Ms. Yates at approximately 9:00 a.m. requesting that she be permitted to visit Mr. Hickson. She received a response to that email at approximately 8:00 p.m. and she was instructed to call the Defendant Hospital to set up visits.

52.     Two hours later. on June 11, 2020, at 10:10 p.m., the hospice staff found Mr. Hickson dead.

53.     On June 12, 2020, at approximately 9:45 a.m., Mrs. Hickson called the Defendant Hospital to schedule a visit and was told by a Defendant Hospital nurse that she would have to contact Family Eldercare to arrange a visit. Mrs. Hickson pushed back, and the nurse consulted

one of the Defendant Hospital's social workers who instructed her to call Family Eldercare. Mrs. Hickson left voicemail messages and sent emails to both Ms. Drake and Ms. Yates. At approximately 11:00 a.m., someone from hospice called Mrs. Hickson and stated that Family Eldercare asked them to convey that Mr. Hickson passed away around 10:00 p.m. the night prior and that his body was sent to a funeral home in the city.

54.    On June 29, 2020, Mrs. Hickson posted a video on Facebook of herself talking about what happened to Mr. Hickson at the Defendant Hospital, the failings of Family Eldercare, the nursing home and others.

55.    On July 2, 2020, the Defendant Hospital's chief medical officer, Defendant Dr. Anderson, posted a statement on the Defendant Hospital's website defending the Defendant Hospital's actions in this case. In doing so, Defendant Dr. Anderson disclosed a significant amount of Mr. Hickson's protected health information to support the Defendant Hospital's contention that it did not discriminate against Mr. Hickson in its decision to withhold treatment but that he had multiple system organ failure. In the written statement Defendant Dr. Anderson wrote derogatorily about Mrs. Hickson (without mentioning her by name) stating, among other things, how uncommon for guardianship to be taken away from a family member and that the court declined to appoint "his wife" as his temporary guardian. The statement also stated that Mrs. Hickson was allowed visitation and that "security was present." Defendant Dr. Anderson further wrote that he had "legal authority" to disclose the protected health information, despite the fact that his authority was given by the temporary guardian, Ms. Drake, after the demise of Mr. Hickson.

**COUNT I**

**DISABILITY-BASED DISCRIMINATION UNDER SECTION 504 OF THE**
**REHABILITATION ACT OF 1973, 29 U.S.C. § 794**

(Against Defendant Hospital by Mrs. Hickson as the Dependent Administrator of the Estate of
Michael Hickson, Deceased, on behalf of Mr. Hickson, individually under the Texas Survival
Act)

56.     Plaintiff incorporates by reference paragraphs 1 to 55 above.

57.     At all relevant times herein, Defendant Dr. Cantu was an agent of and acting within

the regular scope of her relationship with Defendant Hospital and therefore the Defendant Hospital

is vicariously liable for the acts and omissions of Dr. Cantu.

58.     At all relevant times herein, Defendant Dr. Vo was an agent of and acting within

the regular course and scope of his relationship with the Defendant Hospital  and therefore the

Defendant Hospital is vicariously liable for the acts and omissions of Dr. Vo.

59.     Plaintiff brings this action under Section 504 of the Rehabilitation Act of 1973

("Section 504"), 29 U.S.C. § 794. Mr. Hickson, a person with multiple disabilities, was

intentionally and deliberately denied the benefit of the Defendant Hospital's services as a result of

his disabilities through the acts of its agents, Defendants Dr. Cantu and Dr. Vo.

60.     Defendant Hospital receives Federal financial assistance in the form of

reimbursement from Medicare and Medicaid programs as described herein and is therefore subject

to the nondiscrimination mandates of Section 504.

61.     At all times relevant herein, there was in full force and effect a statute known

as the Rehabilitation Act of 1973, 29 U.S.C. §701 *et seq.*, and its implementing regulations,

45 C.F.R. § 84.4(a), which provides in pertinent part as follows:

A.     "No otherwise qualified individual with a disability…shall, solely by reason
of her or his disability, be excluded from the participation in,  be denied the
benefits of, or be subjected to discrimination under any program or activity
receiving Federal financial assistance…**."** 29 U.S.C.§794(a);

B.     An individual with a disability is "otherwise qualified" to participate in covered programs and activities if that individual "meets the essential eligibility requirements for the receipt of such services." 45 C.F.R. § 84.3(l)(4);

C.     "Program or activity" means all of the operations of an entire corporation if assistance is extended to such corporation as a whole or the corporation is principally engaged in the business of providing health care services and any part of the corporation receives federal financial assistance. 29 U.S.C. §794(b)(3)(A)(i) and (ii); 45 C.F.R. §84.3(k)(3)(i)(A) and (ii);

D.     "Federal financial assistance" means "any grant, loan, contract…or any other arrangement by which the Department [of Health and Human Services] provides or otherwise makes available assistance in the form of… [f]unds." 45 C.F.R. §84.3(h);

E.     "No qualified [{person with a disability} shall, because a recipient's facilities are inaccessible to or unusable by [persons with disabilities]be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity to which this part applies." 45 C.F.R. §84.21; and

F.     "In providing health, welfare, or other social services or benefits, a recipient may not, on the basis of [disability]: (1) Deny a qualified [person with a disability]these benefits or services… (3) Provide a qualified [person with a disability]with benefits or services that are not as effective as the benefits or services provided to others… (4) Provide benefits or services in a manner that limits or has the effect of limiting the participation of qualified[persons with disabilities]." 45 C.F.R. § 84.52(a).

62.     Given the health and medical conditions of Mr. Hickson upon arrival to Defendant Hospital, Mr. Hickson was eligible for Defendant Hospital's medical services and was therefore a "qualified person with a disability." as set forth in 45 C.F.R. § 84.3(l)(4).

63.     Almost immediately upon Mr. Hickson's arrival to the Defendant Hospital's emergency department an emergency room physician recommended to Defendant Dr. Cantu to consider placing Mr. Hickson on hospice care and/or designating him as DNR. In less than one hour after Mr. Hickson arrived in emergency department, Dr. Cantu admitted him to the Hospital and without bothering to assess potential treatment response, began her plan to place Mr. Hickson

on DNR and transfer him to hospice rather than transferring him to an intermediate medical care unit where he could have received a higher level of care and assess the efficacy of treatment. Although the laboratory results showed he was responsive to the antibiotics initially provided and identified the specific infectious bacterial organism for targeted antibiotics, without any basis by which to assert Mr. Hickson had a terminal illness Defendants Dr. Cantu and Dr. Vo concluded that Mr. Hickson was not worth treating. Not only did they stop the antibiotics that were demonstrably effective, but they stopped all life-sustaining nutrition and hydration. In making that decision, they deprived Mr. Hickson of his legal and civil rights not to be discriminated against on the basis of his disability.

64.     Defendants Dr. Cantu's and Dr. Vo's intentional and deliberate acts and omissions alleged herein violated Section 504 and its implementing regulations in one or more of the following respects:

A.     Based on his underlying disabilities that precluded him from walking and talking, they denied Mr. Hickson the opportunity to obtain the benefit of the full and equal enjoyment of medical services, privileges, advantages or accommodations of Defendant Hospital;

B.     Based on his underlying disabilities that precluded him from walking and talking, they denied Mr. Hickson the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or combination of Defendant Hospital;

C.     Based on his underlying disabilities that precluded him from walking and talking, they failed to offer or afford Mr. Hickson services that are not equal to those afforded to other individuals who could walk and talk; and

D.     Based on his underlying disabilities that precluded him from walking and talking, they denied Mr. Hickson the opportunity to benefit from the services and facilities of Defendant Hospital, because of the belief that he had no quality of life given his disabilities.

65.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. §794(a)(2), states that the "remedies, procedures and that the rights set forth in Title VI of the Civil Rights Act of 1964

[42 U.S.C. §2000(d) *et seq.*] shall be available" for violations of section 504 of the Rehabilitation Act.  By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

66.    Plaintiff Mrs. Hickson is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. §794(a), as Defendant Hospital's conduct inflicted injury and damages upon Mr. Hickson, including loss of a civil right.

WHEREFORE, Plaintiff Mrs. Hickson prays for the following relief against Defendant Hospital:

A.    A declaration that Defendant Hospital through the acts and omissions of its agents operated in a manner which discriminated against Mr. Hickson on the basis of his disability;

B.    An award of compensatory monetary damages;

C.    An award of reasonable attorneys' fees and costs; and

D.    Such other relief as the Court deems just.

## COUNT II
### Violation of Section 1557 of the Patient Protection and Affordable Care Act, <u>42 U.S.C. § 18116</u>
(Against Defendant Hospital by Mrs. Hickson as the Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson, individually under the Texas Survival Act)

67.    Plaintiff Mrs. Hickson incorporates by reference paragraphs 1 to 55; 57 to 58; and 62 to 63.

68.    At all relevant times herein, there was in full force and effect a statute known as the Patient Protection and Affordable Care Act (the "Affordable Care Act"), 42 U.S.C. § 18001, *et seq.,* Pub.L. 111-148. Section 1557 of the Affordable Care Act ("Section 1557") prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health

programs and activities. 42 U.S.C. § 18116. Section 1557's implementing regulations, 45 C.F.R. §§ 92.1 – 92.203, effective as of July 18, 2016, apply to health programs or activities administered by recipients of Federal financial assistance from the Department of Health and Human Services.

69.     As Defendant Hospital receives reimbursements from the Medicare and Medicaid programs, it is a covered entity subject to compliance with Section 1557.

70.     The implementing regulations of Section 1557 prohibit discrimination against an individual on the basis of disability, *inter alia*, and prohibit an individual from being excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination under any health program or activity. *See* 45 C.F.R. § 92.101(a)(1).

71.     Section 1557's implementing regulations provide that the enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act, *inter alia*, shall be available for purposes of Section 1557 as implemented by this part, and "compensatory damages for violations of Section 1557 are available in appropriate administrative and judicial actions brought under this rule." *See* 45 C.F.R. § 92.301.

72.     Defendant Hospital's conduct constituted violations of Section 1557.

73.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

74.     Plaintiff Mrs. Hickson is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

WHEREFORE, Plaintiff Mrs. Hickson prays for the following relief:

A.      A declaration that Defendant Hospital through its agents operated in a manner which discriminated against Mr. Hickson;

B.      An award of compensatory monetary damages;

C.      An award of attorneys' fees and costs; and

D.      Such other relief as the Court deems just.


## COUNT III
## NEGLIGENCE UNDER TEXAS MEDICAL LIABILITY ACT,
## TX. CIV. PRAC. & REM. CODE §§ 74.001 *ET SEQ.*
(Against Defendants Dr. Cantu and Dr. Vo, jointly and severally, by Mrs. Hickson as the Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson, individually under the Texas Survival Act)


75.      Plaintiff incorporates by reference paragraphs 1 to 55 and 57 to 58 above.

76.      At all relevant times herein, there existed Section 166.044 of the Texas Health and Safety Code, V.T.C.A., Health & Safety Code § 166.044(d).

77.      Section 166.044 of the Texas Health and Safety Code establishes the standard of care that a physician, healthcare facility, or healthcare professional shall exercise when withholding or withdrawing life-sustaining procedures from a *qualified patient*.  Under Section 166.044 that standard of care is that degree of care that a physician, healthcare facility, or healthcare professional, as applicable, of ordinary prudence and skill would have exercised under the same or similar circumstances or a similar community. V.T.C.A., Health & Safety Code § 166.044(d).

78.      A "qualified patient" is a patient with a terminal or irreversible condition that has been diagnosed and certified in writing by the attending physician. V.T.C.A., Health & Safety Code § 166.031(2). An "irreversible condition" means a condition, injury or illness: that may be treated but is never cured or eliminated; that leaves a person unable to care for or make decisions for the person's own self; *and that without life-sustaining treatment* provided in accordance with

24

the prevailing standard of medical care, is fatal. V.T.C.A., Health & Safety Code § 166.002(9)(A)–(C). A "terminal condition" means an incurable condition caused by injury, disease, or illness that according to reasonable medical judgment will produce death within six months, *even with available life-sustaining treatment* provided in accordance with the prevailing standard of medical care. V.T.C.A., Health & Safety Code § 166.002(13) (emphasis added).

79.     Defendants Dr. Cantu and Dr. Vo each had a duty to Mr. Hickson to exercise the degree of care that a physician of ordinary prudence and skill would have exercised under the same or similar circumstances when determining whether Mr. Hickson was a "qualified patient" pursuant to Section 166.044 of the Texas Health and Safety Code.

80.     On June 5, 2020, when Defendants Dr. Cantu and Dr. Vo changed Mr. Hickson's code from full code to DNR, transferred him to hospice, and withdrew all life-sustaining treatment for Mr. Hickson, Mr. Hickson was not a "qualified patient" as he had neither a terminal nor an irreversible condition.

81.     At the time Defendants Dr. Cantu and Dr. Vo transferred Mr. Hickson to hospice and withdrew all life-sustaining treatment, there was no evidence that Mr. Hickson was in multi-system organ failure. At that time, Mr. Hickson was suffering from respiratory failure attributed in large part to Defendants Dr. Cantu's and Dr. Vo's abrupt withdrawal of an intravenous antibiotic, Rocephin, that he was positively responding to, and to their failure to prescribe antibiotics specifically intended to target the infectious bacterial organism, ESBL Klebsiella, after it was identified.

82.     Defendants Dr. Cantu and Dr. Vo breached their duty of care by negligently:

A.      Failing to have and to apply the requisite degree of knowledge, skill and care required by similarly situated physicians in their care and treatment of Mr. Hickson;

B.  Transferring Mr. Hickson to hospice and withdrawing all life-sustaining treatment, including artificial nutrition and hydration despite the absence of an irreversible condition; and

C.  Transferring Mr. Hickson to hospice and withdrawing all life-sustaining treatment, including artificial nutrition and hydration despite the absence of a terminal condition.

83.  Defendants Dr. Cantu's and Dr. Vo's breaches of their respective duties of care, and their subsequent acts and omissions, directly and proximately caused or contributed to Mr. Hickson's pain, suffering and death and the related medical expenses.

84.  "Gross negligence" is defined under the Texas Civil Practice and Remedies Code as "an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." Tex. Civ. Prac. & Rem. Code Ann. § 41.001 (West).

85.  To establish gross negligence, "the act or omission complained of *must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others.*" *Nowzaradan v. Ryans*, 347 S.W.3d 734, 740 (Tex. App. 2011) (citing *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 248 (Tex. 2008) (Emphasis added).

86.  Defendants Dr. Cantu and Dr. Vo knew that withdrawing all life-sustaining treatment, in the clear absence of a terminal condition or an irreversible condition, not only subjected Mr. Hickson to the most extreme degree of risk of harm but was intended to and resulted in the most extreme degree of harm, his death.

WHEREFORE, Plaintiff Mrs. Hickson prays for the following relief:

A.  An award of compensatory monetary damages;

B.      An award of punitive damages;

C.      An award of attorneys' fees and costs; and

D.      An award of prejudgment and post-judgment interest.

E.      Such other relief as the Court deems just.

**COUNT IV**
**NEGLIGENCE *PER SE* IN THEIR FAILURE TO FOLLOW THE PROCEDURES SET FORTH IN § 166.044(d) OF THE TEXAS HEALTH & SAFETY CODE**
(Against Defendants Dr. Cantu and Dr. Vo, jointly and severally, by Mrs. Hickson as the Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson, individually under the Texas Survival Act)

87.     Plaintiff incorporates by reference paragraphs 1 to 55; 57 to 58; and 76 to 81 above.

88.     Negligence *per se* occurs where there is an unexcused violation of a statute designed to protect the class of persons of which the injured party is a member. *Andrade Garcia v. Columbia Medical Center of Sherman*, 996 F.Supp. 605, 611 (E.D. Tex. 1998); *El Chico Corp. v. Poole,* 732 S.W.2d 306, 312 (Tex. 1987). "[C]ourts will not adopt a statute as a standard for negligence unless one of the purposes of the statute is to protect the class of persons to which the injured party belongs from the hazard involved in the particular case." *Carter v. William Sommerville & Son, Inc.,* 584 S.W.2d 274, 278 (Tex. 1979).

89.     Defendants Dr. Cantu and Dr. Vo had a duty of care, pursuant to the Texas Health & Safety Code, to ensure that Mr. Hickson was a "qualified patient" prior to withholding all life-sustaining treatment including artificial nutrition and hydration. V.T.C.A., Health & Safety Code § 166.044(d).

90.     Defendants Dr. Cantu and Dr. Vo breached their respective foregoing duties of care when they deliberately changed Mr. Hickson's code status to DNR, transferred him to hospice and withdrew all life-sustaining treatment despite the absence of a terminal or irreversible condition.

27

91.     As a direct and proximate cause of Defendant Dr. Cantu's and Defendant Dr. Vo's breaches of their respective duties of care and their subsequent acts and omissions, caused or contributed to Mr. Hickson's pain, suffering,  death, and the related medical expenses.

92.     Plaintiff Mrs. Hickson incorporates by reference paragraphs 84 and 85 above.

93.     Defendants Dr. Cantu's and Dr. Vo's unexcused violation of Section 166.044(d) of the Texas Health & Safety Code not only subjected Mr. Hickson to the most extreme degree of risk of harm but was intended to and resulted in the most extreme degree of harm, his death.

WHEREFORE, Plaintiff Mrs. Hickson prays for the following relief:

A.     An award of compensatory damages.

B.     An award of punitive damages.

C.     An award of attorney's fees and costs.

D.     An award of prejudgment and post-judgment interest.

E.     Any and all such other relief as the Court deems just.

## COUNT V
## NEGLIGENCE IN OBTAINING INFORMED CONSENT
(Against Defendants Dr. Cantu and Dr. Vo, jointly and severally, by Mrs. Hickson as the Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson, individually under the Texas Survival Act)

94.     Plaintiff incorporates by reference paragraphs 1 to 55; and 57 to 58 above.

95.     Defendants Dr. Cantu and Dr. Vo, jointly and severally, had the nondelegable duty to obtain informed consent from Mr. Hickson's legal guardian, Family Eldercare, through Nicole Yates and Jessica Drake to change Mr. Hickson's code status from full code to DNR and to transfer him to hospice. *See, T.L. v. Cook Children's Med. Ctr.,* No. 02-20-00002-CV, 2020 WL 4260417, at *33–34 (Tex. App. July 24, 2020, pet. denied) (The common law imposes a nondelegable duty

upon an attending physician to obtain the informed consent of his patient to any proposed form or course of treatment).

96.     A physician must disclose all material risks, benefits, and alternatives which would influence a reasonable person in deciding whether to consent to a recommended medical procedure, so that the patient has sufficient information to make an informed decision. *Id.; see also Roark v. Allen,* 633 S.W.2d 804, 808 (Tex. 1982) (citing *Wilson v. Scott,* 412 S.W. 2d 299 (Tex. 1967) "… [p]hysicians and surgeons have a duty to make reasonable disclosure to a patient of risks that are incident to medical diagnosis and treatment. This duty is based on the patient's right to information adequate for him to exercise and informed consent to or refusal of the procedure.").

97.     Pursuant to Section 74.101 of the Texas Civil Practice & Remedies Code, "*[i]n a suit against a physician or health care provider* involving a health care liability claim that is *based on the failure* of the physician or health care provider *to disclose* or adequately disclose *the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider,* the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." Tex. Civ. Prac. & Rem. Code § 74.101 (Emphasis added). If Section 74.101 does not apply, the common law does, which imposes upon physicians and surgeons the duty to make reasonable disclosure to a patient of risks that are incident to medical diagnosis and treatment. *See, Felton v. Lovett*, 388 S.W.3d 656, 659, 2012 BL 314437, 2 (Tex. 2012) (Citing *Wilson v. Scott*, 412 S.W.2d 299, 301 (Tex. 1967)).

98.     Defendant Dr. Vo, working at the direction of, under the supervision of, or in cooperation with Defendant Dr. Cantu, took charge of communicating with Mr. Hickson's court-appointed temporary legal guardian.

99.     On June 5, 2020, Dr. Vo completed and executed a Family Eldercare Treatment Decision Form, which he sent to Ms. Drake.

100.    The information provided by Dr. Vo on the Treatment Decision Form was the basis for Ms. Drake's consent to the change of Mr. Hickson's code to DNR, his transfer to hospice and the withholding of all life-sustaining treatment, including artificial nutrition and hydration.

101.     The information provided on that form by Dr. Vo is appallingly scant and grossly inadequate by which any person can make an informed consent to withdraw life-sustaining treatment.

102.    With respect to disclosure of Mr. Hickson's prognosis with treatment, Dr. Vo simply wrote "poor as treatment is difficult and likely won't change outcome futile."

103.    Dr. Vo's level of disclosure is grossly inadequate, and he negligently failed to provide information that could have influenced a reasonable person in deciding to give or withhold consent.

104.    Furthermore, Dr. Vo's level of disclosure is grossly inadequate, and he negligently failed to satisfy what a reasonable physician should have disclosed in circumstances where the guardian has to make life or death decisions.

105.    To comply with their duties to obtain informed consent, Defendants Dr. Cantu and Dr. Vo should have disclosed to Ms. Drake all material risks, benefits and alternatives which would influence a reasonable person in deciding whether to consent to hospice transition, DNR and, most critically, the withdrawal of life-sustaining treatment. *See,* Tex. Civ. Prac. & Rem. Code § 74.101; *Peterson v. Shields,* 652 S.W.2d 929, 931 (Tex. 1983) (Holding that informed consent is effective only if the physician disclosed those risks of the proposed treatment that could have influenced a reasonable person in making a decision to give or withhold consent); *Felton v. Lovett*, 388 S.W.3d

656, 661 (Tex. 2012) (Explaining the basis of the common law informed consent duty: is the patient's right to information adequate for him to exercise an informed consent to or refusal of the procedure. The nature and extent of the disclosure depends upon the medical problem as well as the patient).

106.    Defendants Dr. Cantu and Dr. Vo breached their duty of care and were negligent in their failure to provide Ms. Drake with information that could have influenced a reasonable person deciding to give or withhold.

107.    Defendant  Dr. Cantu's and Defendant Dr. Vo's  breaches of their respective duties of care and their subsequent acts and omissions, directly and proximately caused or contributed to Mr. Hickson's pain, suffering and death and the related medical expenses.

108.    Plaintiff Mrs. Hickson incorporates by reference paragraphs 84 and 85 above.

109.    Defendants Dr. Cantu's and Dr. Vo's failure to provide Mr. Hickson's temporary guardians with sufficient information by which to make an informed consent for the change of his status from full code to DNR, transfer to hospice, and withdrawal of artificial nutrition and hydration, not only subjected Mr. Hickson to the most extreme degree of risk of harm but was intended to and resulted in the most extreme degree of harm, his death.

WHEREFORE, Plaintiff Mrs. Hickson prays for the following relief:

A.    An award of compensatory damages.

B.    An award of punitive damages.

C.    An award of attorney's fees and costs.

D.    An award of prejudgment and post-judgment interest.

E.    Any and all such other relief as the Court deems just.

31

## COUNT VI
## NEGLIGENCE IN FAILING TO GUIDE MS. JESSICA DRAKE,
## A TRAINEE, POSSESSING A PROVISIONAL GUARDIANSHIP CERTIFICATE
## IN SUBSTITUTED DECISION-MAKING

(Against Defendants Dr. Cantu and Dr. Vo, jointly and severally, by Mrs. Hickson as the
Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael
Hickson, individually under the Texas Survival Act)

110.    Plaintiff incorporates by reference paragraphs 1 to 55; and 57 to 58 above.

111.    At all relevant times herein, Ms. Drake, who assumed primary responsibility as Mr.

Hickson's legal guardian for her employer Family Eldercare, was a *trainee* guardian, possessing

only a provisional guardianship certificate.

112.    Given that the decision to be made about Mr. Hickson was a life or death decision,

Defendants Dr. Cantu and Dr. Vo had a duty to determine Ms. Drake's experience as a guardian

(*i.e.*, that she was a trainee). They had a duty to explore, consider,  provide to, and discuss with

Ms. Drake all information which would allow for substitute decision-making, particularly as she

only possessed a provisional guardian certification.

113.    Both Defendants Dr. Cantu and Dr. Vo had in-depth conversations with Plaintiff

Mrs. Hickson during which she made her feelings and Mr. Hickson's preferences for end-of-life

decision-making known.

114.    As such, they knew or should have known that Ms. Drake was not exercising

substituted judgment, the standard of care required under the Code of Ethics and Minimum

Standards for Guardianship Services ("Minimum Standards") established by the Texas Office of

Court Administration Judicial Branch Certification Commission, in determining to consent to the

rendering of Mr. Hickson as DNR, transferring him to hospice, and withdrawing all life-sustaining

treatment.

115.    In fact, on June 2, 2020, Defendant Dr. Cantu authored a note in Mr. Hickson's chart to advise the palliative care team that "… family has been conflicted on care goals, wife – full other family prefer DNR has a guardian I believe…"

116.    While Plaintiff Mrs. Hickson did not have legal authority to refuse consent, she knew Mr. Hickson best. She was in the best position to inform Defendants of Mr. Hickson's end-of-life preferences.

117.    Defendants Dr. Cantu and Dr. Vo breached their duty of care and were negligent in their failure to guide Ms. Drake through the substituted decision-making process.

118.    As a direct and proximate result of Defendants Dr. Cantu's and Dr. Vo's breach of their respective duties of care,  and their subsequent acts and omissions, directly caused or contributed to Mr. Hickson's pain, suffering and death and the related medical expenses.

119.    Plaintiff Mrs. Hickson incorporates by reference paragraphs 84 and 85 above.

120.    Defendants Dr. Cantu's and Dr. Vo's failure to provide Mr. Hickson's temporary guardians with sufficient information by which to make an informed consent for the change of his status from full code to DNR and transfer to hospice not only subjected Mr. Hickson to the most extreme degree of risk of harm, but resulted in the most extreme degree of harm, his death.

WHEREFORE, Plaintiff Mrs. Hickson prays for the following relief:

A.    An award of compensatory damages.

B.    An award of punitive damages.

C.    An award of attorney's fees and costs.

D.    An award of prejudgment and post-judgment interest.

E.    Any and all such other relief as the Court deems just.

## COUNT VII
## NEGLIGENCE

(Against the Defendant Hospital and Defendant Hospital Internists, jointly and severally, by Mrs. Hickson as the Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson, individually under the Texas Survival Act)

121.    Plaintiff Mrs. Hickson incorporates by reference paragraphs 1 to 55; 76 to 83; 88 to 91; 95 to 107; 111 to 119 above.

122.    As at all relevant times herein Defendant Dr. Cantu was acting within the regular scope of her employment as an employee of Defendant Hospital Internists and as agent of Defendant Hospital, each of the Defendant Hospital Internists and Defendant Hospital are vicariously liable for the acts and omissions of Dr. Cantu.

123.    As at all relevant times herein Defendant Dr. Vo was an agent of an acting within the regular course and scope of his relationship with the Defendant Hospital, Defendant Hospital is vicariously liable for the acts and omissions of Dr. Vo.

124.    Hospitals owe nondelegable duties to their patients directly, including to not negligently allow the termination of medical care; to use reasonable care in formulating the policies and procedures which govern the medical staff and non-physician personnel; and to exercise reasonable care in the selection of its medical staff and to periodically monitor and review its medical staff's competence. *McCombs v. Children's Medical Ctr. of Dallas*, 1 S.W.3d 256, 259 (Tex. App. – Texarkana 1999, pet. denied) (Holding that a hospital may be directly liable if the hospital breaches a duty which it owes directly to the patient). *Brownsville Medical Ctr. v. Gracia*, 704 S.W.2d 68, 77 (Tex. App.–Corpus Christi 1985, writ ref'd n.r.e.) (Holding that the hospital has a duty to the patient not to negligently allow termination of medical care). The standard for determining whether a hospital has breached its duty is reasonableness: what would an ordinary hospital do under the same or similar circumstances? *Denton Reg'l Med. Ctr. v.*

*LaCroix*, 947 S.W.2d 941, 950 (Tex.App.-Fort Worth 1997, writ dism'd by agr.).

125.    Defendant Hospital and Defendant Hospital Internists each owed Mr. Hickson a duty to exercise the degree of care that a healthcare facility of ordinary prudence and skill would have exercised under the same or similar circumstances in training and supervising their respective agents and employees regarding the requirements of Section 166.044 of the Texas Health and Safety Code.

126.    Defendant Hospital (and were specified below, Defendant Hospital Internists) breached its and their respective duties of care and negligently:

A.      Failed to provide competent physicians and other medical staff in its treatment of Mr. Hickson;

B.      Failed to proper monitor and oversee the services of Defendants Dr. Cantu and Dr. Vo and other medical staff in their treatment of Mr. Hickson;

C.      Failed to have and to apply the requisite degree of knowledge, skill and care required by similarly situated hospitals and medical staffs in its care and treatment of Mr. Hickson;

D.      Failed to use its best judgment in the care and treatment of Mr. Hickson;

E.      Failed, together with Defendant Hospital Internists, jointly and severally, to properly instruct Defendant Dr. Cantu and other medical personnel in the proper assessment of patients as "qualified patients" for purposes of the withdrawal of all life-sustaining treatment;

F.      Failed to properly instruct Defendant Dr. Vo and other medical personnel in the proper assessment of patients as "qualified patients" for purposes of the withdrawal of all life-sustaining treatment;

G.      Negligently permitted the termination of medical care and the withdrawal of all life-sustaining treatment, including artificial nutrition and hydration, by Defendants Dr. Cantu and Dr. Vo, even though Mr. Hickson was not a "qualified patient" as defined in V.T.C.A., Health & Safety Code § 166.031(2);

H.      Failed, together with Defendant Hospital Internists, jointly and severally, to properly train Defendant Dr. Cantu in the proper supervision and coaching of persons possessing provisional guardianship certification in the rendering of informed consent and the exercise of substituted judgment;

I.     Failed to properly train Defendant Dr. Vo in the proper supervision and coaching of persons possessing provisional guardianship certification in the rendering of informed consent and the exercise of substituted judgment;

J.     Failed, together with Defendant Hospital Internists, jointly and severally, to properly train Defendant Dr. Cantu in identifying the level of experience or certification of a court-appointed temporary guardian for purposes of then determining the amount of supervision, guidance and coaching the temporary guardian may require in the rendering of informed consent, substituted judgment and in making other healthcare decisions; and

K.     Failed to properly train Defendant Dr. Vo in identifying the level of experience or certification of a court-appointed temporary guardian for purposes of then determining the amount of supervision, guidance and coaching the temporary guardian may require in the rendering of informed consent, substituted judgment and in making other healthcare decisions.

127.   Defendant Hospital's and Defendant Hospital Internists' breach of their foregoing respective duties of care, and their subsequent acts and omissions, directly and proximately caused or contributed to Mr. Hickson's pain, suffering and death and the related medical expenses.

128.   Plaintiff Mrs. Hickson incorporates by reference paragraphs 84 and 85 above.

129.   Defendant Hospital's and Defendant Hospital Internists' breach of their respective duties and their subsequent acts and omissions not only subjected Mr. Hickson to the most extreme degree of risk of harm but was intended to and resulted in the most extreme degree of harm, his death.

WHEREFORE, Plaintiff Mrs. Hickson prays for the following relief:

A.     An award of compensatory damages.

B.     An award of punitive damages.

C.     An award of attorney's fees and costs.

D.     Prejudgment and post-judgment interest.

E.     Any and all such other relief as the Court deems just.

## COUNT VIII
## SECTION 1983 CIVIL ACTION FOR DEPRIVATION OF 14TH AMENDMENT
## RIGHT TO LIFE, 42 U.S.C.A. § 1983

(Against Defendant Hospital, Defendant Dr. Cantu and Defendant Dr. Vo, jointly and severally, by Mrs. Hickson as the Dependent Administrator of the Estate of Michael Hickson, Deceased, on behalf of Mr. Michael Hickson, individually under the Texas Survival Act)

130.    Plaintiff Mrs. Hickson incorporates by reference paragraphs 1 to 55 and paragraphs 76 to 83 above.

131.    Section 1983, 42 U.S.C. § 1983, is the statutory vehicle for plaintiffs to recover damages for violations of federal constitutional or statutory law against those acting under the color of state law.

132.    Courts have recognized that hospitals and medical providers step into the shoes of the state and act under the color of state law when they make the determinations to withdraw life-sustaining treatment from individuals traditionally encompassed by the *parens patriae* power of the state without strictly adhering to the statutes and regulations governing the provision of care to such individuals.  *See, e.g.*, *T.L. v. Cook Children's Medical Center*, 2020 Tex. App. LEXIS 5791, *32-131 (Tex. App.—Fort Worth July 24, 2020, pet. denied) (Holding that a private hospital acts under the color of state law when it makes the determination to withdraw life-sustaining treatment from a child against the wishes of the parents without strictly adhering to applicable regulations governing such a procedure). Similarly, the state has traditional and exclusive *parens patriae* power to protect the needs of individuals with disabilities if the family is prevented for whatever reason for performing that role, as has been recognized since even before the development of early common law in this country.  *See, e.g.*, *Alfred L. Snapp & Sons v. P.R.*, 458 U.S. 592, 600 (1982).

133.    In the manner described in this Complaint, Defendants violated Mr. Hickson's constitutional rights intentionally and subjected  him to unlawful, unequal treatment on the basis of disability in violation of the 14th Amendment of the United States Constitution.

134.    Defendants Hospital, Dr. Cantu and Dr. Vo intentionally withdrew all life-sustaining treatment of Mr. Hickson because of his disability, and because he could not walk, and he could not talk, and such acts and omissions were objectively unreasonable and undertaken intentionally with willful, reckless, and callous indifference to Mr. Hickson's constitutional rights.

135.    Defendants Hospital, Dr. Cantu and Dr. Vo imposed substantial harm on Mr. Hickson from June 5, 2020, the date in which they transferred him to hospice, rendered him DNR, withdrew all life-sustaining treatment including artificial nutrition and hydration, until he ultimately passed away on June 11, 2020. The amount of excruciating pain, suffering, and hunger Mr. Hickson felt during those final days until his death is unquantifiable.

136.    Defendants Hospital, Dr. Cantu and Dr. Vo violated Mr. Hickson's constitutional rights and intentionally subjected him to unlawful, unequal treatment on the basis of his disability in violation of the 14th Amendment of the United States Constitution.

137.    Mr. Hickson lost the opportunity to live the rest of his life and to be with his family.

138.    Plaintiff Mrs. Hickson has experienced monumental loss from the death of her best friend, husband for 18 years, and father to her five children.

139.    Punitive damages may be awarded in Section 1983 cases under certain circumstances.  *See, e.g.*, *Heaney v. Roberts*, 846 F.3d 795, 803 (5th Cir. 2019) ("Punitive damages may be awarded in sec. 1983 cases 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" (Citing, *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)). Reckless indifference has been described by the Supreme Court as "subjective consciousness" of a risk of injury or illegality and a "criminal indifference to civil obligations." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999).

140.   Defendants Hospital, Dr. Cantu and Dr. Vo knew and intended when they made their decision to withdraw all life-sustaining treatment from Mr. Hickson that their decision would result in Mr. Hickson's death. Defendants specifically contemplated his death as a result of their actions and omissions. In doing so, they displayed criminal indifference to their civil obligations and to Mr. Hickson's constitutional rights, wrongfully causing his death.

141.   The preservation of human life is of paramount importance, such that any deprivation of life without following the dictates of the statutory and regulatory regime designed to protect life has criminal implications.  *See, e.g.*, *T.L.*, 2020 Tex. App. LEXIS 5791, *109-131.

142.   Pursuant to 42 U.S.C. § 1988, reasonable attorney's fees are available to the prevailing party in a Section 1983 action.

WHEREFORE, Plaintiff Mrs. Hickson prays for the following relief:

A.   An award of compensatory damages.

B.   An award of punitive damages.

C.   An award of attorney's fees and costs.

D.   An award of prejudgment and post-judgment interest.

E.   Any and all such other relief as the Court deems just.

### COUNT  IX
### WRONGFUL DEATH UNDER THE WRONGFUL DEATH STATUTE
### TEX.CIV.PRAC. & REM.CODE §§ 71.001 *ET SEQ*

(Against all Defendants, except Dr. Anderson, jointly and severally, and behalf of
Plaintiff Mrs. Hickson, individually, and as the Next Friend of Plaintiffs, Mackenzie Hickson,
Maceo Hickson and Madison Hickson and by Plaintiff Marques Hickson)

143.   Plaintiff Mrs. Hickson, individually, and as the Next Friend of Plaintiffs Mackenzie Hickson, Maceo Hickson and Madison Hickson, and Plaintiff Marques Hickson, incorporates by reference paragraphs 1 to 55; 76 to 83; 88 to 91; 95 to 107; 111 to 119 above.

144.    At all relevant times herein, Defendant Dr. Cantu was acting within the regular scope of her employment as an employee of Defendant Hospital Internists and as agent of Defendant Hospital, and each of the Defendant Hospital Internists and Defendant Hospital are vicariously liable for the acts and omissions of Dr. Cantu.

145.    At all relevant times herein, Defendant Dr. Vo was an agent of an acting within the regular course and scope of his relationship with the Defendant Hospital, and Defendant Hospital is vicariously liable for the acts and omissions of Dr. Vo.

146.    Defendant Hospital Internists, as the employer of Dr. Cantu, and Defendant Hospital, as the principal of its agents Defendants Dr. Cantu and Dr. Vo, are liable for their acts and omissions of their employees and agents performed within the scope of their employment and agency relationship under the theories of *respondeat superior* and *vicarious liability*. S*ee Vecellio Ins. Agency, Inc. v. Vanguard Underwriters Ins. Co.,* 127 S.W.3d 134, 138 (Tex. App.-Houston [1st Dist.] 2003) (citing *St. Anthony's Hosp. v. Whitfield*, 946 S.W.2d 174, 178 (Tex.App.-Amarillo 1997, writ denied)) (Vicarious liability is liability placed upon one party for the conduct of another, based solely upon the relationship between the two). Under the doctrine of *respondeat superior*, an employer is exposed to liability not because of any negligence on its part, but because of the employee's negligence in the scope of that employment. *Vecellio Ins. Agency, Inc.,* citing  *Marange v. Marshall*, 402 S.W.2d 236, 238 (Tex.Civ.App.-Corpus Christi 1966, writ ref'd n.r.e.).

147.    Pursuant to the Texas Wrongful Death Act "[a] person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default." Tex. Civ. Prac. & Rem.Code Ann. § 71.002(b) (West 2008).

40

148.     The decedent's surviving spouse, children, and parents are the statutory beneficiaries for purposes of bringing a wrongful death action. *Id.* § 71.004(a).

149.     The Wrongful Death Act seeks to compensate the decedent's statutory beneficiaries for their loss of future care, maintenance, and support. *Russell v. Ingersoll–Rand Co.,* 795 S.W.2d 243, 247 (Tex.App.-Houston [1st Dist.] 1990), *aff'd,* 841 S.W.2d 343 (Tex.1992). Wrongful death statutory beneficiaries are also entitled to recover damages for loss of companionship and mental anguish. *See Elliott v. Hollingshead,* 327 S.W.3d 824, 834 (Tex.App.-Eastland 2010, no pet.).

150.     Pursuant to the Texas Civil Practice and Remedies Code, when the death is caused by the willful act or omission or gross negligence of the defendant, exemplary as well as actual damages may be recovered. Tex. Civ. Prac. & Rem. Code § 71.009.

151.     Plaintiffs Melissa Hickson and the surviving biological children of Mr. Hickson, Mackenzie Hickson, Maceo Hickson, Madison Hickson and Plaintiff Marques Hickson, . are the statutory beneficiaries of Mr. Hickson as contemplated in the Texas Civil Practice and Remedies Code, Section 71.004(a).  Tex. Civ. Prac. & Rem. Code § 71.004(a).

152.     Defendants' gross negligence, willful acts and omission as set forth in each of the preceding causes of action resulted in the wrongful death of Mr. Hickson resulting in the loss of society, companionship, care, guidance, affection, consortium, and inflicted extreme emotional and mental anguish.

WHEREFORE, Plaintiff Mrs. Hickson, individually and as the Next Friend of Plaintiffs Mackenzie Hickson, Maceo Hickson and Madison Hickson and Plaintiff Marques Hickson, pray for the following relief:

A.     An award of compensatory damages.

B.     An award of punitive damages.

C.     An award of attorney's fees and costs.

D.      An award of prejudgment and post-judgment interest.

E.      Any and all such other relief as the Court deems just.

## COUNT X
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against Defendant Dr. Anderson and Defendant Hospital, on behalf of Plaintiff Mrs. Hickson, individually)

153.    Plaintiff Mrs. Hickson, individually adopts and incorporates by reference paragraphs 1 to 55 above.

154.    At all relevant times during the acts and omissions set forth above and below, Defendant Dr. Anderson was acting within the scope of his employment relationship with Defendant Hospital as its chief medical officer. Defendant Hospital, as his employer, is liable for his actions performed within the scope of his employment relationship under the theories of *respondeat superior* and *vicarious liability*. S*ee Vecellio Ins. Agency, Inc. v. Vanguard Underwriters Ins. Co.,* 127 S.W.3d 134, 138 (Tex. App.-Houston [1st Dist.] 2003) (citing *St. Anthony's Hosp. v. Whitfield*, 946 S.W.2d 174, 178 (Tex.App.-Amarillo 1997, writ denied)) (Vicarious liability is liability placed upon one party for the conduct of another, based solely upon the relationship between the two). Under the doctrine of *respondeat superior*, an employer is exposed to liability not because of any negligence on its part, but because of the employee's negligence in the scope of that employment. *Vecellio Ins. Agency, Inc.,* citing *Marange v. Marshall*, 402 S.W.2d 236, 238 (Tex.Civ.App.-Corpus Christi 1966, writ ref'd n.r.e.).

155.    Under Texas law, intentional infliction of emotional distress is a cause of action for egregious conduct that might otherwise go unremedied. *Johnson v. Blue Cross/Blue Shield of Texas*, 375 F. Supp. 2d 545, 549 (N.D. Tex. 2005) (quoting *Hoffmann—La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438 , 447 (Tex. 2004)).   Mental-anguish damages also are generally

available for intentional infliction of emotional distress—a "gap-filler" tort that was "created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hardin v. Obstetrical & Gynecological Assocs. P.A.,* 527 S.W.3d 424, 436 (Tex. App. 2017) (Citing *Hoffmann-La Roche*, 144 S.W.3d 438, 447 (Tex. 2004)).

156.    "To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hardin,* 527 S.W.3d 436 (Tex. App. 2017) (Citing *Hoffmann–La Roche*, 144 S.W.3d at 445).

157.    "Malice" is defined as a specific intent to cause substantial injury or harm. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (Vernon 2006).

158.    On June 5, 2020, as Mr. Hickson was fighting for his life in Defendant Hospital, and while Mrs. Hickson was consumed by the weight of her husband potentially dying, Defendant Hospital instructed, permitted, or otherwise required Mrs. Hickson to be escorted by the Defendant Hospital's uniformed security officers when she visited Mr. Hickson. This occurred  without any indication whatsoever in Mr. Hickson's medical or other records that Mrs. Hickson was a threat, abusive, or intended to harm Mr. Hickson or any other person.

159.    On June 5, 2020, Defendant Hospital's uniformed security officers stayed by Mrs. Hickson's side at all times that she was in the Defendant Hospital. This included: private moments while she and her children were communicating via FaceTime with Mr. Hickson as he was in the intensive care unit; escorting her upon her departure through the Defendant Hospital; into the parking lot;  and remained observing her until her vehicle left the Defendant Hospital's premises.

43

160.    On June 8, 2020, Plaintiff Mrs. Hickson called Defendant Hospital for an update and was only told that Mr. Hickson was "comfortable". Plaintiff Mrs. Hickson requested to FaceTime with Mr. Hickson and was told they would call her back. They never did.

161.    On June 9, 2020, Mrs. Hickson again called Defendant Hospital for an update and was told he was "comfortable." She again requested FaceTime with him and was again told they would call her back. They never did.

162.    On June 10, 2020, Mrs. Hickson once again called St. David's for an update and was again told that he was "comfortable." She was then informed that she could not FaceTime with Mr. Hickson as Defendant Hospital's iPad had been broken but they would find another one and call her back. Again, they never did.

163.    As Mrs. Hickson was desperately seeking information regarding Mr. Hickson's well-being and begging for his life to be saved, on June 10, 2020, without any explanation or basis given, acting in concert with Ms. Drake, Defendant Hospital unconscionably followed Ms. Drake's instruction to one of Defendant Hospital's social workers that information about Mr. Hickson "be kept confidential and wife not involved."

164.    On June 11, 2020, at approximately 8:45 a.m., Plaintiff Mrs. Hickson called Defendant Hospital for an update and was advised that no information was available about Mr. Hickson and she was subsequently told to contact Family Eldercare, which she attempted to on numerous occasions that day.

165.    On June 11, 10:10 p.m., the hospice staff found Mr. Hickson dead, and Defendant Hospital failed to advise Mrs. Hickson.

166.    On June 12, 2020, at approximately 10:00 a.m., with the firm belief that her husband was still alive, Plaintiff Mrs. Hickson called Defendant Hospital to schedule a visit. Rather

than inform Mrs. Hickson that her husband had passed, Defendant Hospital's nurse told Mrs. Hickson that she would have to contact Family Eldercare to arrange a visit. Plaintiff Mrs. Hickson pushed back, and the nurse consulted one of Defendant Hospital's social workers who instructed Plaintiff Mrs. Hickson to call Family Eldercare.

167.    On June 12, 2020, at approximately 11:00 a.m., approximately 13 hours after Mr. Hickson's demise and five days after being promised an update, someone from Defendant Hospital finally called Plaintiff Mrs. Hickson and stated that Family Eldercare asked them to convey that Mr. Hickson passed away 10:00 p.m. on June 11 and that his body was sent to a funeral home in the city.

168.    On July 2, 2020, Defendant Dr. Anderson, who knew or reasonably should have known the profound grief Mr. Hickson's demise had caused Mrs. Hickson and her children, posted or cause to be posted on Defendant Hospital's website a statement wherein he disclosed certain of Mr. Hickson's protected health information, made public the existence of a court appointed guardian, deliberately pointing out the guardianship court's declination of appointing Mrs. Hickson as Mr. Hickson's guardian and how uncommon it is for a court to take guardianship away from a family member, and that security was present for her visits with her husband.

169.    Plaintiff Mrs. Hickson was never asked and never gave consent to Defendant Dr. Anderson or any employee, agent, or other person associated with Defendant Hospital to release any of Mr. Hickson's protected health information.

170.    The statement published by the Defendant Hospital and Defendant Dr. Anderson on July 2, 2020 was done with malice, solely and exclusively to demean, discredit and belittle a grieving widow, who in the last days of her husband's life was deliberately denied information as to his well-being, was denied a means to visit him in his last days, and whose husband was denied

the benefit of the Defendant Hospital's services because of his disability and was deliberately denied artificial hydration and nutrition despite the absence of a terminal or irreversible condition, and left alone to die for six days in the Hospital.

171.    From any objective viewpoint, security was not required to closely escort Mrs. Hickson throughout the Defendant Hospital and to her car or to monitor her departure from the Defendant Hospital's premises on June 5, 2020.

172.    From any objective viewpoint, there was no rational basis to withhold any information, even the minimum basic level information about Mr. Hickson's condition, to his wife, Plaintiff Mrs. Hickson.

173.    From any objective viewpoint, there was no rational basis to withhold information regarding the condition of her husband and to deny Mrs. Hickson FaceTime visits with her husband from June 8 through June 11, 2020.

174.    From any objective viewpoint, there was no rational basis not to inform Plaintiff Mrs. Hickson, immediately upon its occurrence, of the demise of her husband, at which time temporary guardianship would cease, and no rational basis to delay providing that notice for approximately 13 hours.

175.    From any objective viewpoint, the level of details of the guardianship proceeding were not necessary to be included in the statement in order for Defendant Hospital to explain what occurred to Mr. Hickson, other than to deliberately demean, discredit, belittle and cause substantial injury to Plaintiff Mrs. Hickson. The fact that she was escorted by security did not need to be included in the statement for the Defendant Hospital to explain what occurred; rather, it was deliberately included to demean, discredit and cause substantial injury to Plaintiff Mrs. Hickson. Defendant Dr. Anderson's statement was extreme and outrageous.

176.    Each of the foregoing was and all of them together were extreme and outrageous under the circumstances under which they were done and were done so with malice.

177.    As a direct and proximate result of all of the foregoing, Plaintiff Mrs. Hickson sustained severe emotional distress, anger, severe depression, outrage, loss of sleep and severe anxiety.

WHEREFORE, Plaintiff Mrs. Hickson prays for the following relief:

A.    An award of compensatory damages.

B.    An award of punitive damages.

C.    An award of attorney's fees and costs.

D.    An award of prejudgment and post-judgment interest.

E.    Any and all such other relief as the Court deems just.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

Dated: June 10, 2021

WHITBURN & PEVSNER, PLLC

By: _/s/ Mark Whitburn_____
Mark Whitburn, Esq., One of Plaintiff's
Attorneys

Mark Whitburn, Esq.
Texas Bar Number: 24042144
Sean Pevsner, Esq.
Texas Bar Number: 24079130

Whitburn & Pevsner, PLLC
2000 E. Lamar Boulevard, Suite 600
Arlington, Texas 76006
Telephone: (817) 653-4547
Fax: (817) 653-4477
mwhitburn@whitburnpevsner.com
spevsner@whitburnpevsner.com

Jennifer M. Sender, Esq.
*Pro hac vice (pending)*
Andrés J. Gallegos Esq.
*Pro hac vice (pending)*
Robbins, Salomon & Patt, Ltd.
180 N. LaSalle, Suite 3300
Chicago, IL 60601
Telephone: (312) 782–9000
Fax: (312) 782-6690
jsender@rsplaw.com
agallegos@rsplaw.com