**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MELISSA HICKSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| **v.** | ) | **A-21-CV-514-LY** |
| | ) | |
| **ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP, et al.** | ) | |
| | ) | |
| **Defendants** | ) | |

**PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATIONS**
**OF UNITED STATES MAGISTRATE JUDGE FILED AUGUST 8, 2022**

**TO THE HONORABLE U.S. DISTRICT JUDGE:**

Plaintiffs Melissa Hickson, *et al.,* respectfully objects to and requests the Court to reconsider the United States Magistrate Judge's Report and Recommendations (the "Report"), dated August 8, 2022, to Defendant St. David's Healthcare Partnership, L.P., LLP's ("SDHP") Motion to Dismiss (Dkt. #11); Defendant Carlye Mabry Cantu's ("Dr. Cantu") Motion to Dismiss (Dkt. #10); and Defendant Viet Vo's ("Dr. Vo") Motion to Dismiss (Dkt. #13). Plaintiffs file these objections, as authorized by Federal Rule of Civil Procedure 72(b)(2) and as required by *Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

## I. INTRODUCTION

"***[H]is quality of life is different than theirs. They were walking, talking***." That was the exact reason Defendant Dr. Vo gave to Mrs. Hickson on June 5, 2020, for his refusal to treat Mr. Hickson as he was treating others for COVID-19. Dkt. #1 at ¶ 39. Previously in the conversation, Dr. Vo justified his decision to transfer Mr. Hickson to hospice and be placed on Do Not

Resuscitate: "***as of right now, his quality of life, he doesn't have much of one.***" *Id.* These assertions, under the circumstances in which they were made, constitute intentional discrimination based solely on Mr. Hickson's disabilities. This is an intentional discrimination *and* healthcare liability case. The two are not mutually exclusive. Physicians and hospitals are just as capable as any other recipient of federal financial assistance of discriminating against persons with disabilities. This Court should not turn a blind eye to the possibility that a supposed exercise of medical judgment may mask discriminatory motive, especially when the offending physician unabashedly broadcasts his motive.

Like the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), is a federal disability antidiscrimination law which prohibits disability-based discrimination by recipients of federal funds. 29 U.S.C. § 794(a). Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), another of the federal disability antidiscrimination laws, prohibits discrimination based on any of the grounds protected under Title VI, Title IX, the Age Discrimination Act, and Section 504, during the provision of health care. 42 U.S.C. § 18116(a). "The remedies, procedures, and rights available under [Section 504] parallel those available under the ADA." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020). Thus, precedent interpreting or applying the ADA applies with equal force to a claim under Section 504. *Id.* Similarly, "for disability-discrimination claims, [Section 1557] incorporates the substantive analytical framework of the [Section 504]." *Id.* at 378 (explaining "we will analyze [plaintiff's] [Section 504] and [Section 1557] claims together.").

With respect to Plaintiffs' claims under 42 U.S.C. § 1983, the Magistrate Judge erred in four material ways in the Report by recommending dismissal of those claims based on a failure to show that Defendants acted under color of state law. First, the Magistrate Judge erred in

discounting the significance of the seminal Texas court of appeals opinion in *T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9 (Tex. App.—Fort Worth July 24, 2020, pet. denied), because state court decisions are not binding on federal courts. However, the Magistrate Judge overlooked the fact that Plaintiffs cite *T.L.* not as binding precedent, but rather as the most meaningful and appropriate indicator of how Texas courts determine the scope and boundaries of the law of their state. The scope and boundaries of Texas law, in turn, are critical inquiries in determining whether Defendants acted under color of state law—precisely the inquiry on the basis of which the Magistrate Judge recommends dismissal of Plaintiffs' claims under 42 U.S.C. § 1983.

Second, the Magistrate Judge incorrectly distinguished *T.L.* on the basis of features relevant only to a legal proposition for which Plaintiffs did not cite the case. The Magistrate Judge deemed relevant the fact that *T.L.* involved a child and a mother who did not consent to the withholding or withdrawing of treatment from her child. However, the Magistrate Judge overlooked the fact that these features only relate to one of the traditional and exclusive powers of the State discussed in *T.L.*—the power of a parent "to give, withhold, and withdraw consent to medical treatment for their children." Plaintiffs do not cite *T.L.* in connection with this traditional and exclusive power of the State, but rather in connection with a second and independent traditional and exclusive power of the State—"the sovereign authority of the state, under its police power, to regulate what is and is not a lawful means of dying, naturally or otherwise." *T.L.*, 607 S.W.3d 9, 76 (Tex. App. 2020). The features through which the Magistrate Judge distinguished *T.L.* from this case do not apply to that second independent traditional and exclusive power of the State, as discussed below.

Third, Plaintiffs have identified still a third traditional and exclusive power of the State applicable in the current context—the power to protect the needs of individuals with disabilities if the family is prevented for whatever reason [from] performing that role. The Magistrate Judge

made no reference to this power, overlooking the fact that Defendants' arrogation of this power to themselves and their substitution of their own value judgments regarding the worth of the life of a person with a disability for the value judgments of the Texas legislature placed them in the role of state actors for purposes of Section 1983.

Finally, the Magistrate Judge overlooked and made no reference to Plaintiffs' contention that the court-appointed guardians of Michael Hickson had themselves acted under color of state law in making decisions about his life and death under the circumstances present in this case and that, in light of their joint action and participation with those guardians, Defendants acted under color of state law as well.

Plaintiffs' objections here are limited to the Magistrate Judge's recommendations with respect to Defendants' motions to dismiss Plaintiffs' claims of disability-based discrimination under Section 504 and under Section 1557; as well as to violations of 42 U.S.C. § 1983. Plaintiffs do not file objections to the Magistrate Judge's other recommendations in the Report. If a party timely objects to the magistrate judge's recommendations or findings, the district court must determine *de novo* any part of the objectionable portion of the recommendations or findings. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). The District Court may then accept, reject or modify the recommendations or findings, in whole or in part. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

## II. ARGUMENT

### A. Disability-Based Discrimination.

The United States Supreme Court has held that the ADA applies in the "context of medical treatment decisions." *Bragdon v. Abbott*, 524 U.S. 624 (1998). In *Bragdon,* the Court applied the ADA to a dentist's refusal to treat a patient because she had HIV. *Id.* In *Olmstead v. L.C.,* 527 U.S.

581 at 603 n.14 (1999), the Court held the ADA imposes significant obligations on States regarding the provision of mental health treatment and that "States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id.* The Supreme Court disavowed any holding "that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'" *Id.* (internally quoting Thomas, J., dissenting at 623-24).

In addition, in one of its early decisions interpreting Section 504, *Alexander v. Choate*, 469 U.S. 287, 301 n.21 (1985), the Supreme Court instructed that States could not permissibly evade the bar on disability-based discrimination simply by turning the absence of a disability into a qualification for a job or benefit. The Court explained, "[a]ntidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit." *Id.* (quoting Brief for United States as *Amicus Curiae* Supporting Petitioners at 29 n.36, 469 U.S. at 301 (No. 83-727)). Thus, the Court held that "[t]he benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified –[individuals with disabilities] the meaningful access to which they are entitled." *Id.* at 301.

Here, SDHP does not assert that Plaintiffs failed to plead enough facts to state a claim to relief under Sections 504 or 1557 that is plausible on its face as required by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Rather, it asserts Section 504 and Section 1557 do not apply here as Plaintiffs' claims are merely medical malpractice claims, to which the Magistrate Judge concurred. To accept SDHP's argument and the Magistrate Judge's recommendation is to permit SDHP to evade the bar of disability-based discrimination by simply turning the absence of a disability into a qualification of its medical services.

Dr. Vo expressly defined the absence of disability as a qualification for care and treatment. SDHP refused to provide care and treatment to Mr. Hickson because in Dr. Vo's *normative judgment*, and clearly not his *medical judgment*, Mr. Hickson had no quality of life due to his physical disabilities – *he could not walk or talk* – and therefore he was not worth treating. Dr. Vo did not refuse treatment because Mr. Hickson's disabilities would interfere with his treatment. Dr. Vo did not refuse treatment because there was a risk of creating an adverse medical outcome due to Mr. Hickson's disabilities. This is no less discriminatory than if Dr. Vo stated that he would not treat Mr. Hickson because he is *black*.

Just like Title VI of the Civil Rights Act of 1964, 42 U.S.C. 20000d, *et seq*., prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance, the federal disability antidiscrimination laws, in particular Section 504, patterned after Title VI,[1] establish that disability *per se* may never be the basis of denying individuals opportunities. Section 504 provides that

> "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance …"

29 U.S.C. §794.

Section 504 mandates that recipients of federal financial assistance may not differentiate between individuals on grounds that one or more is disabled, and to do so is discriminatory.

[1] *See* Section 504 Senate Report, which stated: Section 504 was patterned after, and is almost identical to, the antidiscrimination language of section 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d–1 (relating to race, color, or national origin), and section 901 of the Education Amendments of 1972, 42 U.S.C. 1683 (relating to sex). The section therefore constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap. S.Rep. No. 1297, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 6373, 6390.

Congress' clear intent in enacting Section 504 was to bar the use of disability, standing alone, as a qualification or disqualification for the receipt of needed benefits from covered entities. As physicians' human biases often lead them to make unduly negative prognoses regarding their disabled patients (*see,* Dkt. #1 at ¶ 4), the federal disability antidiscrimination laws are designed to significantly serve as a check against those biases. Healthcare providers are not exempt from the mandates of the federal disability antidiscrimination laws, and accordingly they may not deny treatment because a patient has a pre-existing disability. When the well-pleaded facts of the Plaintiffs' Complaint are taken as true, the allegations set forth a claim that SDHP and Dr. Vo discriminated against Mr. Hickson based on his disability in refusing to provide him treatment and transfer him to hospice. There are additional allegations in the Complaint that set forth a separate claim for medical negligence (*see*, Dkt. #1 at ¶¶ 75-86), but that in no way preempts or cancels the disability-based discrimination claims as they are not mutually exclusive.

The Magistrate Judge erred in accepting Defendants' series of cited case as authoritative here ignoring that those cases that are factually distinguishable to the case at bar. In *Kim v. HCA Healthcare, Inc*., 2021 WL 859131 (N.D. Tex. Mar. 7, 2021), plaintiff asserted claims under Section 504 as she was confined in a mental health facility against her will. In *Guthrie v. Niak*, 2017 WL 770988, (S.D. Tex. Feb. 28, 2017), the gravamen of plaintiff's claims under Section 504 challenged the propriety of the providers' medical decisions in taking away his wheelchair and moving him out of the prison infirmary. In *G.T. by Rolla v. Epic Health Servs*., No. 17-CV-1127-LY, 2018 WL 8619803 (W.D. Tex. Dec. 27, 2018) (Lane, M.J.), *adopted by*, 2019 WL 2565245 (W.D. Tex. Apr. 11, 2019), plaintiff alleged a home health care provider violated Section 504 by, *inter alia,* failing to modify his treatment plan to address his behavioral concerns, his communication needs and failing to properly train staff to care for him. None of those cases

contains facts that a hospital and its staff failed to provide treatment on the *stated* sole basis of the plaintiff's disability unrelated to the acute medical conditions for which treatment was sought – as is the case here.

Moreover, the Defendants and the Magistrate Judge rely on inapposite cases cited in *Kim* to support the general rule that medical treatment decisions cannot form the basis of a Section 504 or Section 1557 claim. Those cases hold that the federal disability antidiscrimination laws do not apply to a provider's decision to deny treatment when the medical condition of the disability itself is the basis for the treatment, which is not the factual case here. *E.g.*, *Burger v. Bloomberg*, 418 F.3d 882 (8th Cir. 2005) (per curiam) (held that plaintiff's claimed inadequate medical care for treatment of decedent's underlying disability, diabetes, was not disability-based discrimination); *Fitzgerald v. Corr. Corp. of America*, 403 F.3d 1134 (10th Cir. 2005) (held that prisoner plaintiff "was not otherwise qualified" within the meaning of Section 504 for treatment in the absence of his disability because the medical condition of his alleged disability, a broken hip, was itself the reason he sought medical treatment); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289 (11th Cir. 2005) (held that plaintiff was not "otherwise qualified" within the meaning of Section 504 "because she would not have had any need for a feeding tube to deliver nutrition and hydration but for her medical condition."); *Lesley v. Hee Man Chie*, 250 F.3d 47 (1st Cir. 2001) (held that a pregnant plaintiff who was transferred to a different hospital after testing positive for HIV could not demonstrate she was denied treatment solely by reason of her disability). The court in *United States v. Univ. Hosp., State Univ. of New York at Stony Brook*, 729 F.2d 144 (2d Cir. 1984), provided a succinct explanation of this general rule. In *University Hospital*, plaintiffs refused to consent to surgical procedures necessary to prolong the life of their infant daughter, who was born with multiple birth defects. *Id.* In fact, in *University Hospital* the court found it significant that the

"'otherwise qualified"' element of Section 504 requires eligibility for a program "'in spite of"' any underlying disability. *Id.*, at 156 (quoting Doe v. New York Univ., 666 F.2d 761, 775 (2d Cir. 1981)). The court concluded that "[S]ection 504 prohibits discrimination . . . only where the individual's [disability] is unrelated to, and thus improper to consideration of, the services in question. *Id.* The Court explained "[w]here the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory.'" *Id.*, at 157. *See, also, Zamora-Quezada v. HealthTexas Med. Grp. of San Antonio*, 34 F. Supp. 2d 433, 445 (W.D. Tex. 1998) ("Under section 504 of the Rehabilitation Act, claims may be raised when medical treatment decisions are based solely on an individual's disability, as opposed to other criteria . . ."); *Naiman v. New York Univ.,* No. 95 Civ. 6469(LMM), 1997 WL 249970, at *2 (S.D.N.Y. May 13, 1997) (holding the ADA and Section 504 applied as plaintiff's "claims relate to his exclusion from the participation in his medical treatment, not the treatment itself.").

This case is the factually opposite case of *University Hospital* and the other cases cited in *Kim* but is the exact type of case the *Kim* Court concluded that the prohibitions of Section 504 apply. Here, Mr. Hickson's disabilities – spinal cord injury, cortical blindness, and traumatic brain injury (resulting in his inability to walk and talk) – were unrelated to the health conditions he sought to be treated – pneumonia, urinary tract infection, sepsis, and potentially COVID-19. Instead, Mr. Hickson was – in blatant terms as expressed by Dr. Vo – denied treatment for medical conditions wholly unrelated to his underlying disabilities *because* the provider believed those disabilities made Mr. Hickson's life less worth living and less worthy of treatment than persons without those disabilities.

To hold that Plaintiffs' allegations do not state a cause of action for disability-based discrimination would effectively insulate medical care providers from liability for refusing to provide medical treatment on a discriminatory basis. Plaintiffs respectfully urge this Court not to adopt the recommendations of the Magistrate Judge with respect to their claims under Section 504 and Section 1557.

**B. Section 1983.**

With respect to Plaintiffs' claims under 42 U.S.C. § 1983, the Magistrate Judge recommends dismissal based on the conclusion that Defendants did not act under color of state law. The Magistrate Judge gives short shrift to the Texas court of appeals holding in *T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9 (Tex. App.—Fort Worth July 24, 2020, pet. denied), in part because, as a Texas state court case, it is not binding on federal courts. However, Plaintiffs do not cite the *T.L.* holding as binding on federal courts. Rather, Plaintiffs cite the *T.L.* case as the most recent and most seminal Texas case regarding the ambit of Texas state law. After all, Section 1983 applies to any individual acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia . . . ." 42 U.S.C.A. § 1983. Consequently, in applying Section 1983 in this case, the Court must analyze Texas statutes, ordinances, regulations, customs, or usages. The Texas Supreme Court is best equipped to make such determinations, but, in the absence of a dispositive holding from that court, federal courts often look to intermediate appellate courts. *See, e.g., Bradford Realty Servs. v. Hartford Fire Ins. Co.*, 2022 U.S. App. LEXIS 12720, *8 n.3 (5th Cir. May 11, 2022) ("Although the Texas Supreme Court is the state's highest judicial authority and, therefore, the only court that can say for certain what Texas law *is*, we often look to Texas intermediate courts for 'the strongest indicator of what [the Texas Supreme Court] *would* do, absent a compelling reason to believe that the [Texas

Supreme Court] would reject the lower courts' reasoning.'") (citation omitted, emphases in original). *See also U.S. Bank Nat'l Ass'n v. Lamell*, 2022 U.S. App. LEXIS 15251, *7-8 (5th Cir. June 2, 2022) (citing "lower state court decisions" as among the factors a federal court should use to determine issues of state law in the absence of a direct ruling from the Texas Supreme Court on the issue). Here, far from having a compelling reason to believe that the Texas Supreme Court would reject the lower court's reasoning in *T.L.*, this Court has a compelling reason to believe the opposite. The Texas Supreme Court denied the petition for review in *T.L.*, thus expressly declining an opportunity to weigh in on its holding. The court of appeals' decision in *T.L.* thus provides this Court with the best guidance as to the scope of Texas law so that this Court can determine whether Defendants acted under color of that law.

Misled by Defendants, the Magistrate Judge then focused only on two features of *T.L.*—(1) the fact that the case involved a minor child, not present here; and (2) the fact that the minor child's mother refused to consent to the recommended treatment, whereas Mr. Hickson's temporary legal guardians consented to Defendants' recommended treatment. However, by focusing on the presence of a minor child in *T.L.*, Defendants and the Magistrate Judge place their entire emphasis on the first of two traditional and exclusive public functions—the power of the state to supervene the rights of parents or guardians to make medical decisions. However, Defendants and the Magistrate Judge miss the fact that the court in that case found a second and independent "traditional and exclusive public function" at issue in the case that was not limited in applicability to minor children: "the sovereign authority of the state, under its police power, to regulate what is and what is not a lawful means or process of dying, naturally or otherwise." *T.L.*, 607 S.W.3d at 76. It is precisely this sovereign authority of the state at issue here. Defendants usurped the state's police power to make determinations as to what constitutes a lawful means or

process of dying. Defendants' actions are no less usurpations in this regard just because they did not target the life of a child.

Defendants and the Magistrate Judge erred with respect to the second feature which they claimed distinguished *T.L.* from the current case—the fact that in *T.L.* the mother did not consent to the recommended course of treatment, while here the temporary legal guardians of Mr. Hickson did so consent. This consideration applied only to the first of the two traditional and exclusive public functions at issue in *T.L.*—the power of the state to supervene the rights of parents or guardians to make medical decisions. In connection with such a public function, it naturally makes a difference whether or not the parents or guardians consented. That consideration does not apply, however, to the second independent traditional and exclusive public function addressed by the court in *T.L.*—the sovereign authority of the state, under its police power, to regulate what is and what is not a lawful means or process of dying, naturally or otherwise. For example, the State of Texas does not allow death by *sati* or *hara kiri* or any other form of torture or murder, regardless of whether a family member or court-appointed guardian gives consent or even encouragement to such a practice. Neither does the State of Texas allow the infliction of death through slow starvation or dehydration, except in a manner carefully regulated by the State itself under rigorously prescribed circumstances. For Defendants to have brushed those regulations aside and to deprive Michael Hickson of food and water until he died without adhering to applicable state regulations was to usurp a traditional and exclusive public function, to clothe themselves in the *parens patriae* power of the state, and to act under color of state law. The Magistrate Judge erred in recommending dismissal of Plaintiffs' claims under Section 1983.

Furthermore, Plaintiffs do not rely only on the holding in *T.L.* to support their Section 1983 claim. On the contrary, Plaintiffs have also pointed to the fact that Defendants exercised a third

traditional and exclusive *parens patriae* power ordinarily reserved to the State—the "power to protect the needs of individuals with disabilities if the family is prevented for whatever reason [from] performing that role . . . ." *See, e.g., Alfred L. Snapp & Son v. P.R.*, 458 U.S. 592, 600 (1982) (noting the traditional *parens patriae* power with respect to individuals with disabilities)[2]. The State of Texas has exercised this *parens patriae* power by enacting legislation to protect individuals with disabilities from discrimination of exactly the sort that occurred in this case. *See, e.g.*, Texas Health & Safety Code § 592.001, *et seq.* (enacting the Persons with Intellectual Disabilities Act and confirming that, for example, "[e]ach person with an intellectual disability in this state has the rights, benefits, and privileges guaranteed by the constitution and laws of the United States and this state" (§ 592.011(a)). Defendants usurped the *parens patriae* power of the State of Texas by (1) substituting their own value judgment for that of the State of Texas in deeming Michael Hickson's life worth less than that of a non-disabled patient, and (2) acting on that substituted value judgment by withholding life-saving treatment, including food and hydration, until Michael Hickson died. The Magistrate Judge never mentioned this independent basis for Plaintiffs' claims under Section 1983, but this basis demonstrates yet again that Defendants acted under color of state law.

The Magistrate Judge never referenced Plaintiffs' final independent basis for the Section 1983 claims either. The court-appointed legal guardians for Michael Hickson, temporary though they were, exercised the maximum powers available to them to consent to the termination of

[2] "'*Parens patriae*,' literally 'parent of the country,' refers traditionally to the role of the state as sovereign and guardian of persons under legal disability." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 n.8, 102 S. Ct. 3260, 3265 n.8, 73 L.Ed.2d 995 (1982) (quoting Black's Law Dictionary 1003 (5th ed. 1979)). "Traditionally, the term was used to refer to the King's power as guardian of persons under legal disabilities to act for themselves." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 257, 92 S. Ct. 885, 888, 31 L.Ed.2d 184 (1972).

Michael Hickson's life. In doing so, they engaged in actions attributable to the state. *See, e.g.*, *Reguli v. Guffee*, 371 Fed. Appx. 590, 601 (6th Cir. 2010); *Kirtley v. Rainey*, 326 F.3d 1088, 1095 (9th Cir. 2003). As Defendants jointly engaged with these guardians who wielded these powers in a manner attributable to the state, they can themselves be held liable under Section 1983. *See, e.g.*, *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 319 (5th Cir. 2019) ("Private persons, jointly engaged with state or municipal officials in the challenged action, are acting under color of law for purposes of § 1983 actions.")

The Magistrate Judge addressed only one of Plaintiffs' three independent bases for the claims under 42 U.S.C. § 1983 and, as demonstrated above, erred in the analysis of that basis. Consequently, Plaintiffs respectfully urge this Court not to adopt the recommendations of the Magistrate Judge with respect to their claims under Section 1983.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to reject the Magistrate Judge's recommendations in the Report relating to Plaintiffs' claims for disability-based discrimination under Section 504 and Section 1557 and reject the Magistrate Judge's Report recommendation relating to Plaintiffs' claim for violation of Section 1983.

Respectfully submitted,

Dated: August 22, 2022

/s/ Jennifer M. Sender
Jennifer M. Sender, Esq.
*Pro hac vice*
Andrés J. Gallegos Esq.
*Pro hac vice*
Robbins DiMonte, Ltd.
180 N. LaSalle, Suite 3300
Chicago, IL 60601
Telephone: (312) 782–9000
Fax: (312) 782-6690
jsender@robbinsdimonte.com
agallegos@robbinsdimonte.com

Mark Whitburn, Esq.
Texas Bar Number: 24042144
Sean Pevsner, Esq.
Texas Bar Number: 24079130
Whitburn & Pevsner, PLLC
2000 E. Lamar Boulevard, Suite 600
Arlington, Texas 76006
Telephone: (817) 653-4547
Fax: (817) 653-4477
mwhitburn@whitburnpevsner.com
spevsner@whitburnpevsner.com

**CERTIFICATE OF SERVICE**

I hereby certify by my signature below that a true and correct copy of the foregoing document will be served on all attorneys of record via the Court's Electronic Filing System on this 22nd day of August 2022.

/s/ Jennifer M. Sender